Yolande ROBBINS, Plaintiff,

v.

BOARD OF EDUCATION OF ARGO COMMUNITY HIGH SCHOOL DISTRICT 217, COOK COUNTY, ILLINOIS, et al., Defendants.

No. 69 C 1397.

United States District Court, N. D. Illinois, E. D.

May 25, 1970.

Lightenberg, DeJong & Leahy, Chicago, Ill., for plaintiff.

David P. Schippers, and Dennis M. O'Brien, Schippers, Betar, Lamendella & O'Brien, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

DECKER, District Judge.

This action was brought under the Civil Rights Act of 1871, 42 U.S.C. § 1983, by Yolande Robbins who had been employed as a probationary teacher by defendant Board of Education of Argo Community High School District #217 in Cook County, Illinois. The complaint alleged that Miss Robbins, a young black woman, was not rehired after the 1968–1969 school year because of her various community activities relating to civil rights. The complaint sought damages of $250,000 from the Board, its members, and the Superintendent of Schools during 1968–1969, as well as injunctive relief compelling defendants to rehire plaintiff. An answer was filed denying the pertinent allegations of the complaint, and a trial was held to the court sitting without a jury on February 12 and 13 of this year.

The legal principles applicable to this case are uncomplicated and now well settled. An individual does not relinquish his First or Fourteenth Amendment rights when he becomes a public school teacher, Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and if his teaching contract is not renewed because of the exercise of these rights, the Civil Rights Act provides a remedy. McLaughlin v. Tilendis, 398 F.2d 287 (7th Cir. 1968). Thus the ultimate question

to be determined in this case is whether plaintiff's contract was not renewed because of her civil rights activities, or whether it was not renewed for other reasons.[1]

The testimony given at trial, most of it uncontroverted, establishes the following sequence of events. Plaintiff was hired by defendant Lewis, the Superintendent of Schools, to serve as an English teacher for the last half of the 1967–1968 school year,[2] and was subsequently given a teaching contract for the next school year. During the 1968–1969 school year, approximately 180 of 1700 students and 6 of 103 teachers at Argo High School were black.

Shortly after the 1968–1969 school term began, racial tensions resulted in student walkouts, fighting and school closing at the high school. Miss Robbins attended and spoke to a meeting of parents of black students on the evening of September 11, 1968. She also spoke out at a faculty meeting held the next day and supported the demands made by certain black students. An agreement was subsequently reached between the administration and the black students resolving these specific grievances. Miss Robbins' efforts were instrumental in obtaining this agreement.

Another black student walkout occurred on October 8, 1968, following a sit-in staged in a school corridor. That evening, plaintiff attended a black student meeting, informed the students of the administration's tentative conditions for their readmittance, and suggested that their parents meet to discuss the issue. Later that evening the parents met and formed a Black Parents Committee, and selected plaintiff as a member. The next day plaintiff attended, at the request of Mr. Lewis, an all day meeting with the Black Parents Committee and the school administration. Agreement was reached for readmitting the striking students, and Mr. Lewis subsequently announced this to all the students by reading a document drafted almost entirely by Miss Robbins.

Plaintiff remained active in the Black Parents Committee and met with the school administration as a member thereof on two or three occasions in November and December of that year. On January 23, 1969 plaintiff was called to the office of defendant Lewis to meet with him and Mr. Kovarik, the head of the English Department. The meeting was called because Lewis had learned that Miss Robbins had devoted 40 minutes of time in one class and 15 minutes of time in another to a discussion, initiated by the students, of the school administration's recent action relieving a teacher (Mr. Breitweiser) of his coaching duties because he had grown a beard. During these class discussions, plaintiff had mentioned that the swimming team could boycott future meets as one alternative course of action. Mr. Lewis informed Miss Robbins that he felt she had used bad judgment in her conduct of these classroom discussions.

At that same meeting plaintiff presented defendant Lewis an unsolicited written statement she had prepared wherein she offered to refrain from critical comment in class, to do nothing to encourage student activism, and to resign from sponsorship of the Black Literature Club and any organization which had "come into conflict with the school." Mr. Lewis initially refused to accept the statement, telling Miss Robbins that it was "degrading", "dehumanizing", and would "put a gag" on her. At her urging, however, he took the statement from her, noting on the face of it his objections to it and noting that he would accept the offered proposals "in some modest degree."

1. Because plaintiff was admittedly a probationary teacher, without tenure, no issue is raised as to whether the reasons for non-renewal were adequate under Illinois law. See 122 Ill.Rev.Stat. § 10–22.4.

2. Plaintiff does not allege that her rights were denied during this first half year of employment.

Defendant Lewis' testimony with regard to the meeting, corroborated by testimony of Mr. Kovarik and otherwise uncontroverted, established that Mr. Lewis asked Miss Robbins not to resign from the Black Literature Club or from membership in the Black Parents Committee. He also told her that he did not consider the Black Parents Committee to be in conflict with the school.

Approximately two weeks later, on February 7, 1969, Mr. Lewis attended a meeting of the Black Parents Committee and was asked if a rumor to the effect that Miss Robbins was going to be fired was true. He told the meeting that the rumor was not true and that, in fact, no consideration had been given to firing or re-hiring plaintiff. Plaintiff testified that Mr. Lewis also told the parents that she was an "excellent" teacher. This testimony as to the quality of her teaching, corroborated by Mr. Woody Davis, Chairman of the Black Parents Committee, was directly contradicted by the testimony of Lewis, Mr. Mannot, the Dean of Students, and Margaret Perrin, Mr. Lewis' secretary. Furthermore, no reference to her abilities appears in the minutes of this meeting taken by Mrs. Perrin, and admitted into evidence.

On May 26, 1969, on the recommendation of Mr. Lewis, the members of the Board voted unanimously not to renew plaintiff's contract. Shortly thereafter, Lewis informed Miss Robbins of this decision, and, at her request, told her the reasons behind the Board's decision. The reasons offered were chronic tardiness in the mornings, leaving her classes unattended, making indelicate sexual remarks to her classes, failure to perform hall duty adequately, and holding class discussions of the Breitweiser matter. No mention was made of her participation in civil rights or black students' activities.

To support her contention that the actual motivation behind the decision not to retain her was her activity with regard to black students, plaintiff offered evidence which she claims shows that the school administration was hostile to the exercise of First Amendment rights. For example, it appears that Dean of Students, Mannot, removed a satirical memorandum regarding racially integrated Christmas decorations from Miss Robbins' classroom door, and that Mr. Lewis told her the memorandum was inappropriate because of the immaturity of certain students. Mr. Lewis also criticized Miss Robbins for two offensive sexual references she made when discussing literature with her class. It was also shown that Mr. Lewis suspended a student for having long hair in 1968 and criticized a teacher who objected to this action, and that the school administration prevented the school newspaper from soliciting teacher opinion on questions of dress styles following the Breitweiser affair. It also appeared that Mr. Lewis expressed disapproval of an anti-war song sung by a teacher at a concert and told another teacher that it was "fortunate" he had not spoken up at a School Board meeting wherein Miss Robbins' non-retention was discussed.

To counter plaintiff's evidence of an unlawful motivation for her non-retention, defendants presented evidence to show that plaintiff's performance as a teacher had been unsatisfactory and that the reasons given by Mr. Lewis to Miss Robbins were the actual reasons for her discharge. It was established that Miss Robbins was late in signing in at the school on 140 of the 167 days on which she was in attendance, contrary to school regulations. On one occasion she left school during the day to visit a jailed student, leaving at least one class unattended without signing out, also in violation of school regulations. Miss Robbins also held a party in her classroom on one occasion, in violation of school regulations.

It was further shown that plaintiff was consistently derelict in maintaining and turning in for review her lesson plan book. Indeed, she admitted negligence in this regard in a note to her department head and conceded that it had not been turned in for two and one-half months, although school requirements

called for review every two weeks. Plaintiff also failed to maintain a seating chart, which prompted some substitute teachers to complain to the administration, and failed consistently to report student absences and tardiness to the administration.

Other examples of violations of school regulations on plaintiff's part were her failure to perform required corridor duty at passing periods approximately 50% of the time, her failure in several instances to be in her classroom when class began, and her lateness in returning student themes and papers. Also, the head of the English Department was highly critical of her teaching methods and curriculum and expressed his dissatisfaction in a memorandum to her.

The testimony of various school officials revealed that defendant Lewis was informed of all of the above infractions before he made his recommendation of non-renewal to the School Board. Corroborated testimony also discloses that before making this recommendation, Mr. Lewis sought the advice of Mr. Mannot, the Dean of Students, Mr. Haake, then the Counseling Director, Mr. Lyne, the Curriculum Coordinator, and Mr. Kovarik, the English Department Chairman. Each of these men suggested that plaintiff not be rehired, and gave as reasons various of the above noted infractions of school policy. There is no evidence whatever that any of these men suggested non-renewal because of Miss Robbins' civil rights activities.

At a closed Board meeting on May 19, 1969 defendant Lewis recommended that plaintiff not be rehired and informed the Board of his reasons. The reasons given were chronic tardiness, leaving class unattended on numerous occasions, failures regarding corridor duty, "poor judgment" regarding the Breitweiser beard matter, and the use of offensive sexual references in class. Mr. Lewis testified that he made no mention of plaintiff's outside activities or involvement with black students and parents, and that individual Board members did not do so. This testimony, corroborated by the testimony of Board member Adam Novosad, who attended the meeting, was uncontroverted. Lewis also testified that these activities of Miss Robbins did not enter into the formulation of his recommendation. At a public session of the Board on May 26, 1969, the Board voted not to rehire plaintiff and four other probationary teachers.[3]

Plaintiff attempts to dilute the probative force of this imposing array of evidence by proof that she rarely received written reprimands for her infractions of school rules. It was proved, however, that she was orally reprimanded for leaving the school to visit the jail, for the Breitweiser discussion, and for being late to her classes, and that she was reprimanded in writing for not maintaining plan books, for failing to report student absences, and for holding the unauthorized party. In any event, absence of reprimands is understandable in that plaintiff was an adult, and a professional woman, who was aware of the school regulations which she had breached.

Plaintiff also offered evidence to the effect that other teachers did not consistently comply with school regulations. There was no evidence, however, that any teacher ignored school policy to an extent even approaching that of plaintiff. Miss Robbins also contends that her performance was no less adequate after the February 7, 1969 Black Parents Committee meeting than before. This circumstance is significant, however, only if it is established that defendant Lewis at that meeting said that plaintiff was an excellent teacher. Based on my observations of the witnesses, however, and the minutes taken at that meeting, I have concluded that no such statement was made.

3. The Board made no independent investigation of plaintiff's performance, although one member testified that he heard plaintiff use profane language on two occasions and that he consequently had serious doubts about her professional judgment.

Plaintiff's only other challenge to the evidence of defendants that she was terminated because of her teaching inadequacies is the contention that Mr. Lewis and the school administration showed an "animus" to the exercise of First Amendment rights. The evidence in support of this contention is, however, very insubstantial. There is no direct evidence that Lewis or any other administrator disapproved of plaintiff's activities with black parents or students. And all the examples of Lewis' "hostility" to First Amendment rights must be classified near the outer boundaries of constitutional protection. No cases have been cited, nor is this court prepared to say, that disapproval of a teacher's sexual references in a high school class, or of her suggestion of a student boycott of school events, is a violation of the right of free speech. Nor is disapproval of a racially satirical memorandum necessarily violative of these rights, especially when viewed in the context of a racially tense school climate. Similarly, the legality of school dress standards is an issue that was then and is today in a state of flux. Compare Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), holding a school code regulating hair length unconstitutional with Brownlee v. Bradley Cty., 311 F.Supp. 1360 (E.D.Tenn.1970), upholding a similar regulation, and Neuhaus v. Torrey, 310 F.Supp. 192 (N.D. Cal.1970), upholding a similar regulation as applied to school athletes.

The point is not that Mr. Lewis' administrative actions were all constitutionally permissible, but rather that these actions related to matters on the frontiers of emerging law and therefore have little significance in proving that he harbored an animus against First Amendment rights. To then jump from this arguable "animus" to an inference that Miss Robbins was discharged because of her free speech activism, or because she is black, in the face of direct and substantial evidence to the contrary, is a step this court is not prepared to take.

Furthermore the weight of the evidence as to defendant Lewis' views with regard to free speech and civil rights activities does not support the characterization urged by plaintiff. The evidence showed that Lewis was trying to integrate the faculty when plaintiff was hired, that he told her then that he was glad she was black, that he asked her to help select a teacher for a black studies course and to select black cheerleaders, that he allowed striking black students back into school without disciplinary measures contrary to the advice of two of his administrative assistants, that he took no disciplinary action against black students participating in a disruptive sit-in, that he requested plaintiff to continue her membership in the Black Parents Committee, and that he never refused to meet with this committee and in fact requested meetings on at least three occasions on his own initiative.

I believe the only proper conclusion to draw from all the evidence is that the school administration, through defendant Lewis, was anxious to find solutions to the racial problems which convulsed the school in 1968–1969. To this end, Mr. Lewis found Miss Robbins to be a helpful and needed ally. Rather than being antagonistic to plaintiff's constitutionally protected conduct, he encouraged her to participate in organizational efforts to reach understanding between black students and the administration. The evidence clearly shows that it was plaintiff's differences with Lewis as to the necessity of complying with school administrative regulations, and not her civil rights activities, which led to the decision to terminate her employment.

It is most unfortunate that such differences existed, for there is evidence that plaintiff showed the potential to be a popular and effective teacher at Argo High School. But it is not this court's function to review the necessity or propriety of school regulations regarding the day to day conduct of classes. Brooks v. School District of Moberly, Missouri, 267 F.2d 733, 739

(8th Cir. 1959). Decisions regarding the termination of non-tenured teachers are properly left to school administrators when no constitutional rights have been violated.

Plaintiff has failed to satisfy her burden of proof that she was terminated because of the exercise of her First Amendment rights of speech, assembly and petition, or her Fourteenth Amendment rights to due process and equal protection of the laws. Consequently, no violation of plaintiff's constitutional rights has been shown, and plaintiff is not entitled to the relief sought by her complaint.

Judgment has been entered today against the plaintiff and for the defendants in all respects.