**Donald R. CHASE**

v.

**FALL MOUNTAIN REGIONAL SCHOOL DISTRICT et al.**

**Civ. A. No. 3112.**

United States District Court,
D. New Hampshire.

July 28, 1971.

Jack B. Middleton, Peter B. Rotch, Mc-Lane, Carlton, Graf, Greene & Brown, Manchester, N. H., for plaintiff.

John J. Zimmerman, Faulkner, Plaut, Hanna & Zimmerman, Keene, N. H., for defendants.

## OPINION

BOWNES, District Judge.

Donald R. Chase brought this action relying on 42 U.S.C. § 1983 (1964) against the Fall Mountain Regional School District, and individually against the superintendent, assistant superintendent, and members of the School Board. Plaintiff alleges that the failure of the School District to renew his contract for the 1970–1971 school year is: (1) a denial of his constitutional rights of freedom of speech and association because the decision of the defendants was based in whole or in part on his activities as a negotiator for the Teachers' Union; and (2) a denial of his Fourteenth Amendment right of due process of law in that the action of the School Board was arbitrary, discriminatory, and capricious. Jurisdiction is based on 28 U.S.C. § 1343(3). The case was tried without a jury.

### FINDINGS OF FACT

On March 3, 1970, the School Board of the Fall Mountain Regional District, on recommendation of Stanley Tufts, Superintendent of the School District, voted 5–2 not to renew plaintiff's teaching contract. To ascertain the reasons that brought about this vote, a detailed examination of the facts is required. At the outset, it should be made clear that the evidence discloses, the defendants concede, and I find that the plaintiff is a well qualified, conscientious, and very competent teacher. He developed a program of library training as part of his freshman English classes which is still used today and was developing a new course in Journalism before his contract was not renewed. The facts present a distressing example of how a competent, innovative, and outspoken teacher can

have his entire career effectively blighted by a school superintendent's and school board's blatant disregard of his rights and of the most elemental concepts of justice and fair play.

Upon his graduation from Plymouth State College, the plaintiff received a professional standards teaching certificate from the State of New Hampshire. He taught English at Towle High School in Newport, New Hampshire, from January of 1963 to June of 1965. Although his contract was renewed at Towle for the school year 1965–1966, the plaintiff left teaching and became general manager of radio station WCNL in Newport, New Hampshire, because the salary was substantially higher than his teacher's salary. In the spring or early summer of 1968, the plaintiff decided to leave the radio station and return to teaching because of a change of management at the station.

Henry Bremner, who retired in the early fall of 1968, was the Superintendent of Schools at the time plaintiff was hired by Fall Mountain Regional High School (hereinafter FMRHS) in the summer of 1968. He received two recommendations, one from Howard Kimball, the Principal of Towle High School when plaintiff taught there, and another from Eve Spanos, an English teacher at Towle. Pl.Ex. 14. Both of the recommendations rated the plaintiff "above average" or "best" in almost every category. Mr. Bremner offered, and plaintiff accepted, a position in the English Department at FMRHS for the school year of 1968–1969.

During the school year 1968–1969, plaintiff was an active and outspoken member of the Teachers' Negotiating Committee which was attempting to reach an agreement on teachers' salaries with the School Board. Gordon Gowen, father of one of the girls who complained about the plaintiff in 1970, was the chief negotiator for the School Board during the 1968–1969 school year. During the months of January and February of 1969, the plaintiff issued a number of press releases highly critical of the School Board. The members of the School Board knew the plaintiff was the source of the articles, and he was named in two of the press releases which accused the School Board of "high-handed treatment" and "utter disregard" of its employees. Pl.Ex. 1 & 2. Mr. Tufts, Superintendent of Schools in the District, stated that these releases irritated him because they violated an informal agreement between the School Board and the teachers not to issue press releases without approval of the other party. Mr. Tufts felt that these releases created public animosity toward the School Board and constituted unprofessional conduct by the plaintiff. This view was also expressed in the testimony of four of the five School Board members who voted for non-renewal at the March 3, 1970, meeting. Mr. Hubbard, who was not present at the March 3, 1970, meeting stated that all of the Board members were very upset with the plaintiff because of these press releases. The plaintiff testified that Gordon Gowen and he had many heated arguments in the negotiating sessions and that Mr. Gowen was upset the most by the press releases.

Notwithstanding the press releases of January and February of 1969, Superintendent Tufts recommended that the plaintiff's contract be renewed for 1969–1970. Plaintiff's Exhibit 8 indicates that the Principal of FMRHS, Edward Willis, strongly recommended plaintiff for renewal and rated him excellent or good to excellent in every category. Although there was some discussion about the plaintiff's negotiating activity and the press releases at the March, 1969, School Board meeting when renewals were considered, plaintiff's contract was renewed unanimously.

During the 1968–1969 school year, there were no complaints from any students regarding the plaintiff's conduct. Paul Marx was the only School Board member who testified that he heard rumors about the plaintiff in 1968. He did not state what the rumors were, but did state that acquaintances in Newport

told him they were glad that the plaintiff was in the Fall Mountain District and not in the Newport District.

The critical period is the 1969–1970 school year, particularly the month of January, 1970. In October or November of 1969, Jack Eno, President of the Fall Mountain Teachers' Association, appointed plaintiff the Chairman of the Teachers' Negotiating Committee. Mr. Eno testified that shortly after he appointed plaintiff, Superintendent Tufts told him that the choice of plaintiff as chief negotiator was not a wise one because he antagonized the School Board.

As chief negotiator for the teachers, plaintiff attempted to obtain from the School Board a lengthy and comprehensive agreement covering many conditions of employment. Pl.Ex. 6. The teachers were attempting to obtain authority and responsibility in matters which had always been controlled exclusively by the administration. As the negotiating sessions proceeded through December and early January, plaintiff became more and more disenchanted with the School Board's attitude toward the comprehensive contract and toward him personally. On January 12, 1970, plaintiff, without explanation, abruptly left a negotiating session and did no further negotiating. The members of the School Board testified that plaintiff resigned as negotiator at this January 12 meeting. However, a letter to teachers from plaintiff (PL.Ex. 5) implicitly, if not explicitly, indicates that the plaintiff was still Chairman of the Negotiating Committee as of January 13, 1970. It also explicitly states that plaintiff considered further meetings with the School Board meaningless.

The committee has concluded that negotiations, as such, have not taken place and that further meetings will only serve to delay decisions which each individual teacher must make. We believe that until the situation is presented to the Association, further meetings with the Fall Mountain Regional School Board could in no way serve the best interest of either the students or the teachers of the Fall Mountain Regional School District.

This letter indicates to me that plaintiff was exercising his prerogatives as Chairman of the Negotiating Committee and was recommending a boycott of negotiations until at least the January 20 meeting of the Association. At this meeting, the plaintiff announced that he would no longer serve as negotiator because he was convinced that the School Board's animosity toward him prevented him from being an effective spokesman for the teachers. Plaintiff also severely criticized the School Board personally at this meeting and stated that he had no personal respect for the School Board negotiating team, the School Board itself, or the superintendent of schools. The negotiations were subsequently taken over by Mr. Eno and, in his words, "an unsatisfactory agreement" was finally reached.

During the same period from January 12 to January 20, when plaintiff boycotted the negotiating sessions, the other important facts in this case began to surface. On Monday or Tuesday, January 12 or 13, Janet Haslip, a freshman at FMRHS, made a complaint to Mr. Willis and Arthur Gude, the Assistant Principal, regarding the plaintiff's giving her special attention and touching her on one occasion in the library. On Friday, January 16, Barbara York and Gail Gowen, daughter of Gordon Gowen, made complaints to Mrs. Gude, a teacher at FMRHS and wife of the assistant principal, regarding the plaintiff's conduct toward them.

Miss Haslip entered FMRHS sometime in late October or early November as a transfer student from Rhode Island. The plaintiff spent extra time with her to enable her to catch up with the class and had asked her to do special work such as leading class discussions. She testified that she was upset because, as a result of this special attention, her fellow students sometimes said: "How's your boyfriend, Mr. Chase?" She also testified that she thought the plaintiff was interfering with her privacy when,

after learning that she was going to the doctor's after school, he asked if she was ill and requested that she let him know if everything was all right.

Miss Haslip testified that the touching incident took place in the library during a study hall. It consisted, according to her testimony, of the plaintiff putting his hand on the back of her chair and his fingers touching and rubbing her back. She also stated that plaintiff sat down at the table and intentionally put his hand on top of her hand. There were at least ten people in the library at this time, and one girl was sitting directly across the table from her when this incident happened. She also testified that when she left the library, the plaintiff touched her elbow in full view of the librarian.

These were the only incidents Miss Haslip complained of, but she also testified that the plaintiff gave the class vocabulary words to learn which had a "dirty" meaning. The only concrete example that she could give was the word "nocturnal." According to Miss Haslip, the plaintiff stated, after the class knew the word's meaning, that he was a "nocturnal man." On cross-examination, it was brought out that Miss Haslip had a relatively poor academic record, had been truant from school during the spring of 1970, had flunked plaintiff's English course, and had spoken with Gail Gowen about Mr. Chase prior to her complaint.

Sometime shortly after this complaint, Mr. Willis and Mr. Gude met with the plaintiff who denied the alleged touching and stated that if any touching did occur, it was unintentional.

Miss Haslip's guardian apparently called Gordon Gowen on January 12 or 13 and told him of his ward's complaint. Mr. Gowen was still a member of the School Board, although not a member of the School Board's Negotiating Committee during the school year 1969–1970. Mr. Gowen testified that his daughter, Gail, who had the plaintiff as a teacher in sophomore English, had mentioned things about plaintiff and he, therefore, brought the matter to the attention of Superintendent Tufts at a meeting of the School Board Finance Committee on January 14. On January 15, Superintendent Tufts met with Mr. Willis and Mr. Gude because it was his policy to have this type of things resolved by the administrator closest to the situation.

After school the next day, Friday, January 16, Gail Gowen, Gordon Gowen's daughter, and Barbara York complained about the plaintiff to Mrs. Gude, a teacher at FMRHS and wife of the assistant principal. On January 20, Mr. Willis met with Miss Gowen and Miss York. Although both girls testified that they did not remember exactly what incidents they discussed with Mr. Willis, I must assume that their testimony covers most of their complaints, particularly those they considered most offensive.

Barbara York and Gail Gowen were good friends, and both of them had the plaintiff for freshman English in the 1968–1969 school year and for sophmore English in the 1969–1970 school year. Miss York had no complaints about the plaintiff's conduct in freshman year and stated that plaintiff had never touched her and she had never seen him touch anyone else at any time. Her major complaint involved an incident in class in the late fall of 1969 when the plaintiff asked her to turn off the lights when the class was going to see slides or a movie. She testified that as she turned off the lights she said "Aren't I talented," and the plaintiff made a comment with a "dirty" connotation. Although Miss York could not remember the specific comment, she stated on cross-examination that it had a double meaning, one of which was not "dirty." She testified that the comment upset her because the class laughed. The only other incident involved talk by the plaintiff of measuring her skirt when the class was discussing the school dress code. Miss York was apparently not upset by this comment and could not remember whether it happened in freshman or sophomore year. She also testified that "I always felt as if he was looking me up and down," but there was

"nothing specific or general" about his conduct.

Most of the complaints came from Gail Gowen, the daughter of School Board member Gordon Gowen. She testified that the plaintiff had touched her on at least two occasions, had made numerous personal remarks to her in class, and had made remarks of a "dirty" nature in class. Miss Gowen, like Miss York, had no complaints about the plaintiff in freshman year. The claimed touching incidents occurred on separate occasions in the 1969–1970 school year. The first was after school during the fall when she and Barbara York were walking down the hall. She testified that the plaintiff called her over and asked if she could defend herself against attackers. She testified that he told her not to scream and touched the side of her neck to show her where a "pressure point" was. Miss Gowen testified that the plaintiff did not hurt her and she just backed away. Miss York, who Miss Gowen said was present at the time, stated emphatically on cross-examination that she had never seen the plaintiff touch Gail at any time.

The second alleged incident occurred in the hall between classes on the day she made the complaint. Miss Gowen testified that she was walking down the hall with a group of students between classes and that the plaintiff was walking past her with another teacher. She testified that the plaintiff said something like "Did you hear about Gail Gowen?" or "There's Gail Gowen" and touched her elbow. After this incident, she testified that she and Barbara York jointly decided to complain. Miss Gowen also testified that the plaintiff sometimes put his hand on the back of her chair and touched her back "like it was accidental." She also testified that he stared at her and other girls in the hall and raised his eyebrows, and that plaintiff's facial expressions in general bothered her.

Miss Gowen further testified that the plaintiff spoke of her "love life" before class started and sometimes called her "Bessie-the-cow" or "farm girl" in class because her father owned a farm. Miss York corroborated this testimony. On cross-examination, Miss Gowen admitted that "Bessie-the-cow" and "farm girl" "didn't really bother me that much." Janet Fisk, one of Miss Gowen's classmates, testified that Miss Gowen was having trouble with her boyfriend in January and that the only time she heard the plaintiff speak of Miss Gowen's "love life" was when she came into the classroom crying and plaintiff tried to cheer her up. Miss Gowen also testified that the plaintiff said something like "I know what's on the mind of the class" when the class said the meaning of a word used in mythology was prostitute. She couldn't remember the exact word, but from her testimony, I would guess it was "siren."

On cross-examination, Miss Gowen stated that prior to her complaint, Mr. Chase had upset her because of the way he talked about the School Board in class. She knew plaintiff was the chief negotiator for the teachers, and she was upset because she thought he conveyed to the class that he was better than her father.

Both Miss Gowen and Miss York testified that they had been reprimanded in class by the plaintiff for their behavior in an English class taught by a teacher substituting for the plaintiff. The plaintiff, Miss York, and Miss Gowen all agreed that the plaintiff refused to sign a bus pass enabling them to get a "late bus" after school. Presumably, a late bus pass would have been an affirmation by plaintiff that the girls had been detained for good reason and were, therefore, entitled to late transportation home. Miss York and the plaintiff agreed that the reprimand and the refusal to sign the bus pass took place on the day the two girls complained to Mrs. Gude, but Miss Gowen was unsure of the date. Both girls insisted that this had nothing to do with their complaint. Janet Fisk stated that Miss Gowen and

Miss York told a group of students that they were going to complain as sort of a joke and, after they had complained, they were laughing as they told other students what they said to Mrs. Gude.

All four of the girls who testified stated that there were rumors around the school that the plaintiff had had an affair with a secretary in Newport and dated a high school girl when a senior at Plymouth State. They also stated that the plaintiff was called a "dirty old man" by a number of students. It is important to note that there was no testimony as to exactly when these rumors and the phrase "dirty old man" started. Janet Haslip testified that they started after the touching incidents and the complaints to the principal. This would be the logical and probable time for such rumors to start. It is significant to note that Miss Gowen testified that she passed these rumors on to her father.

Shortly after January 20, Mr. Willis again spoke with the plaintiff. The plaintiff again denied any touching and stated that any touching which might have occurred was unintentional. Mr. Willis told the plaintiff that there was no place for touching in FMRHS and that some girls are overly sensitive to personal remarks. Between then and March 3, Mr. Willis completed his recommendation regarding the renewal of the plaintiff's contract. Mr. Willis strongly recommended that the plaintiff be rehired and rated him excellent in every one of the seventeen categories on the form, including "relationship with students." Pl.Ex. 10. Mr. Willis testified that he strongly recommended the plaintiff's renewal because he "had no proof of any impropriety."

At this point in time, Superintendent Tufts apparently took things into his own hands. He attempted to check the Newport and Plymouth rumors by phone, but got no results from either attempt and the rumors remained unverified. The only result of this limited effort was to feed more fuel to the flames of gossip and rumor. The plaintiff testi-

fied that the Newport rumor was completely false and that he was engaged to his wife, to whom he is still married, while a senior at Plymouth State College. Superintendent Tufts testified that he received inquiries and complaints from parents about the situation and that some parents asked that their children be removed from plaintiff's class.

Mr. Tufts testified that the complaints by the girls, the unsubstantiated rumors, and the telephone calls from parents led to his decision to recommend that the Board not renew plaintiff's contract. He recommended non-renewal because the plaintiff had "lost his effectiveness as a teacher in the District." This recommendation was made notwithstanding that: (1) Superintendent Tufts was not able to check the Newport and Plymouth rumors as to source, inception, or accuracy; (2) He had never spoken with the plaintiff or the girls, and the principal, who had done so, recommended renewal; and (3) In response to any complaints or inquiries from the community at large, he could have easily explained that the situation had been straightened out by Mr. Willis, or made it clear that there would be a full and complete investigation. The superintendent stated adamantly that the recommendation was made solely on the basis of complaints and rumors and that he would have made the same recommendation whether they were true or false.

At the March 3 School Board meeting, the School Board accepted Mr. Tufts' recommendation and voted 5–2 not to renew plaintiff's contract. Although the phrase "not to renew" or "non-renewal" seems less drastic than "dismissed" or "fired," its effect is the same. To put it bluntly, the plaintiff was fired. Gordon Gowen, Paul Cray, Robert Metcalf, Reverend Newell Bishop, and Paul Marx voted for non-renewal. Richard Minard and Paul Lamothe voted against Mr. Tufts' recommendation. The other named defendants were not present or did not vote. Of the five voting for non-renewal, three (Mr. Cray, Mr. Metcalf, and

Reverend Bishop) had heard no rumors or complaints about the plaintiff and nothing about the alleged touching incidents until the meeting. Mr. Marx testified that he had heard rumors in 1968–1969, but never stated what the rumors were. Four of the Board members voting for dismissal did not discuss the matter with the plaintiff or the three girls. Mr. Gowen, of course, had information from his daughter, but had not spoken to plaintiff.

All the members who voted to dismiss plaintiff knew that he was chief negotiator, but all said that this played no part in their decision. They also knew that it was illegal to fire a teacher for union activities. The five Board members, like Mr. Tufts, all testified that it made no difference whether the rumors and the complaints were true or false. Each testified that he thought the plaintiff had "lost his effectiveness." Three teachers at FMRHS, Miss LaBrie, the head of the English Department and plaintiff's immediate supervisor, Mr. Eno, President of the Teachers' Association, and Mr. Osgood all testified that they did not think the plaintiff had lost his effectiveness as a teacher.

On Tuesday, March 9, plaintiff was informed by a letter hand delivered by Assistant Superintendent Bellevance that his contract was not being renewed. Plaintiff testified that he asked Mr. Bellevance why he was being fired and was told that he had "lost his effectiveness in the district." Plaintiff was convinced that he had been fired for his negotiating activities and pressed for a more succinct answer. Mr. Bellevance testified that he implied to the plaintiff that the reason was his relationship with students, but he never directly said that it was a result of the complaints of the three girls and rumors in the community. The plaintiff was never explicitly given the reasons for his dismissal by the School Board or the Administration. Mr. Bellevance gave the plaintiff the option of resigning by Friday, March 12, or having the non-renewal on his record.

Sometime before March 12, plaintiff spoke to Mr. Hubbard, a member of the School Board who was not present for the vote, asking for reconsideration. Shortly thereafter, plaintiff was called by Mr. Bellevance and was told that the Board would not reconsider. Mr. Tufts testified that after March 3, reconsideration was out of the question and nothing would have changed the Board's mind, but he and the members of the School Board did testify that a hearing would have been held if plaintiff had requested it. Mr. Tufts testified that since the plaintiff's reputation was at stake, it was up to plaintiff to request a hearing. Since the testimony makes it clear that reconsideration was out of the question and since the decision was based on rumors, it is difficult for me to understand the purpose of a hearing other than an exercise in hypocrisy. In light of the fact that he had been informed that there would be no reconsideration, plaintiff understandably requested no hearing.

The plaintiff completed the remainder of the school year and there were no complaints of any kind about him. The plaintiff made every effort in the spring and summer of 1970 to locate a teaching position for the 1970–1971 school year, including applying for teaching positions fifty and sixty miles from his home, but received no offers. He entered his name with the New Hampshire Education Association's placement service and ultimately with New Hampshire's Department of Employment Security. He was unemployed until December of 1970 when he was hired by the New Hampshire Education Association in a non-teaching position which pays a higher salary than he would be making as a teacher. In the spring of 1970, plaintiff was elected moderator of the Town of Croyden, and in the fall of 1970, he was elected to the New Hampshire Legislature as representative from Croyden and Cornish.

I cannot find from the evidence that the plaintiff was dismissed solely because of his activities as negotiator for

the teachers. Nor can I find, however, that he was dismissed solely because of the complaints and rumors. Under these facts, I find that the plaintiff's dismissal was based both on his constitutionally protected rights and on the complaints of the three girls and the resultant rumors about his past conduct. The complaints, such as they are, and the unsubstantiated rumors are certainly surface reasons, but his activities as negotiator clearly contributed to what can only be termed as a total disregard and lack of concern on the part of a superintendent and a School Board as to the truth of the complaints and the rumors and the failure of the School Board and Mr. Tufts to objectively assess their effect on plaintiff's suitability as a teacher at FMRHS. Even if all the testimony of the girls is believed, and I find that much of it is exaggerated and some of it untrue, it is clear to me, as it apparently was to Mr. Willis, that the facts fall far short of demonstrating any impropriety by the plaintiff. The court takes judicial notice of the fact that girls of the age of those who complained here are at a stage of increasing sensitivity and awareness of the sexual relationship of man and woman. Consequently, any unintended or intended touching, even as innocent as the type complained of here, or any remarks or comments with the remotest sexual connotation, may be interpreted by a sensitive young girl in a way completely uncontemplated and unintended. This, plus the very important fact that Gail Gowen, a close friend of Barbara York and a friend of Janet Haslip, felt that the plaintiff was criticizing and down-grading her father, were important factors to be weighed in analyzing the situation—factors which Mr. Willis undoubtedly had considered when he strongly recommended renewal.

While I do not think the members of the School Board were deliberately lying when they said the plaintiff's negotiating activities had nothing to do with their decision, I cannot, and will not, believe that the School Board would dismiss a competent teacher solely on the basis of uninvestigated complaints of impropriety and unsubstantiated rumors of misconduct in the past. The plaintiff's negotiating activities had a profound bearing, either consciously or unconsciously, on the decision not to renew. The language of the Fourth Circuit Court of Appeals in Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), is appropriate here. There, the plaintiff alleged that she was not rehired because of her racial activity, and the School Board gave the reason for nonrenewal as insubordination. The court said: "To accept * * * [this reason] we would have to pretend not to know as judges what we know as men." Id. at 182.

## RULINGS

There is no doubt that a teacher may not be excluded from employment or dismissed in violation of his constitutional rights of freedom of speech and association. See, e. g., Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Orr v. Thorpe, 427 F.2d 1129 (5th Cir. 1970). But a School Board certainly has a right to dismiss a teacher who actually makes improper sexual advances toward female students, even if the teacher has exercised his rights of free speech and association and in so doing has antagonized the school administration. Cf. Robbins v. Board of Education, 313 F.Supp. 642 (N.D.Ill.1970). When a violation of constitutional rights is alleged, however, the reasons given for dismissal must be closely examined to make certain that they are not simply a facade to conceal the fact that dismissal was for activity protected by the Constitution. In this case, the evidence discloses that the reason given for dismissal was not entirely a facade, but based partially upon the decision of the superintendent and School Board that the complaints and rumors had nullified the effectiveness and competency that

the parties agreed plaintiff exhibited prior to January of 1970. I must, therefore, disregard the First Amendment involvement for the moment and closely scrutinize the reason actually given by the School Board and superintendent, and the facts underlying that reason, to determine if the decision is constitutionally permissible. The plaintiff alleges that the decision of the School Board was arbitrary and capricious. The issue then becomes whether a non-tenured teacher is protected by the due process clause of the Fourteenth Amendment from an arbitrary, capricious, and wholly unreasoned decision not to renew his contract.

The starting point in resolving this issue is Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir. 1970), cert. den., 402 U.S. 972, 91 S.Ct. 1659, 29 L.Ed.2d 137. There, the First Circuit held that a non-tenured teacher has no right to a hearing, but has a right to be given the reasons for the Board's decision not to renew. However, the court stated that, because this was a "novel" solution, the rule established in *Drown* would only be applied to "those cases where a decision not to rehire is made subsequent to the date of this opinion." Id. at 1188. Since *Drown* was decided in December of 1970, and the decision not to rehire the plaintiff was made in March of 1970, the plaintiff here was neither entitled to a hearing nor to the reasons for the decision not to renew. Consequently, the School Board did not violate procedural due process.

*Drown*, however, makes it clear that a teacher "has an interest in being rehired sufficient to prevent the school district from not doing so for constitutionally impermissible reasons." Id. at 1183. *Drown* also points out that freedom of speech and association are constitutionally impermissible reasons for non-renewal.

There remain the teacher's interest in protecting his constitutional rights, such as free speech, and protecting himself against a decision made in bad faith. It is not easy for us to believe that a significant number of decisions not to rehire non-tenured teachers rest on either ground. In any case, the teacher asserting a constitutional right has guaranteed access to the federal courts. Id. at 1186.

The court further noted that "bad faith may rise to a constitutional level, in which case the federal courts are available . . . ." Id. at 1187.

I am of the opinion that the decision in *Drown* implicitly recognizes a right of recovery for arbitrary, discriminatory, or capricious dismissal of a non-tenured teacher in violation of due process. Among the cases cited by the First Circuit for its conclusion that teachers' contracts cannot be terminated for constitutionally impermissible reasons is Johnson v. Branch, 364 F.2d 177 (4th Cir. 1966), cert. den., 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967). There, as here, the contract was renewable at the discretion of the school authorities. The court specifically held: "[W]e find that the action of the school board was arbitrary and capricious." Id. at 182. The court went on to find that the only reasonable inference for dismissal of the plaintiff on the trivial charges involved was the School Board's objection to her racial activity.

Although there is authority to the contrary, Freeman v. Gould Special School District, 405 F.2d 1153 (8th Cir.), cert. den., 396 U.S. 843, 90 S.Ct. 61, 24 L.Ed.2d 93 (1969), I think the better rule is that a non-tenured teacher is protected from arbitrary, discriminatory, or capricious non-renewal. This opinion finds strength in the decisions of the Supreme Court. In Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), the Court struck down Oklahoma's loyalty oath for state officers and employees because it was an "assertion of arbitrary power" which "offends due process." Id. at 191, 73 S.Ct. 215. The Court stated:

It is sufficient to say that constitutional protection does extend to the

public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory. Id. at 192, 73 S.Ct. at 219.

This view was also expressed in Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In *Schware,* the Court reversed the Supreme Court of New Mexico's determination that Schware was not morally qualified to practice law and was rightfully excluded from the bar examination. The Court stated:

A State cannot exclude a person from the practice of law or from any other occupation in a manner *or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment.* * * * Even in applying permissible standards, officers of a State cannot exclude an applicant *when there is no basis for their finding that he fails to meet these standards* . . . . Id. at 238–239, 77 S.Ct. at 756. [Emphasis added.]

The Supreme Court has stated that the "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960). This means not only protection of freedom of speech and association, but protection from arbitrary, discriminatory, and capricious actions in violation of due process. This position has been adopted and applied to non-tenured teachers by the Fourth Circuit in Johnson v. Branch, *supra,* and by Judge Doyle in Roth v. Board of Regents, 310 F.Supp. 972 (W.D.Wis.1970), and Gouge v. Joint School District No. 1, 310 F.Supp. 984 (W.D.Wis.1970).

▌ One of the primary reasons why due process protection must be applied is because of the grave consequences of non-renewal for a non-tenured teacher. Non-renewal, particularly under the facts of this case, is tantamount to dismissal. There is no doubt that non-renewal effectively prevents a teacher from obtaining another teaching position, thereby preventing a teacher from pursuing his chosen profession. In this case, the ramifications are even more broad because they extend to reputation. The action of the School Board brands the plaintiff at best as sexually promiscuous and at worst as a seducer of young school girls. When the ability to pursue a profession and reputation are involved, fundamental constitutional rights are to be strictly protected to prevent arbitrary state action. See *Schware, supra;* Birnbaum v. Trussell, 371 F.2d 672 (2nd Cir. 1966).

The court is cognizant of the fact that a School Board has wide discretion in the reasons for dismissal, but it is elemental that whatever reasons are given must be supported by facts. Some courts have established a "basis in fact" test for review of a School Board's decision not to renew a teacher's contract. In Gouge v. Joint School District No. 1, *supra,* the court held:

[A] teacher in a public elementary or secondary school is protected by the due process clause of the Fourteenth Amendment against a nonrenewal decision which is wholly without basis in fact and also against a decision which is wholly unreasoned, as well as a decision which is impermissibly based (such as race, religion, or exercise of First Amendment freedom of expression). Id. at 991.

Cf. Schware v. Board of Bar Examiners, *supra.* Other courts have employed a "substantial evidence" test. Ferguson v. Thomas, 430 F.2d 852 (5th Cir. 1970).

Whatever test is applied to the facts of this case, it is clear that the action of the superintendent and the School Board was arbitrary, capricious, without basis in fact, wholly unreasoned, and not based on substantial evidence. No investigation was made to determine the truth of the complaints of impropriety by any member of the Board or by Superintendent Tufts and the resultant rumors were completely unverified and unsubstantiated. Mr. Gowen, of course,

is in a different position than the other members of the Board because his daughter had complained to the administration and had talked with him about the plaintiff. While a parent's concern and natural tendency to believe his child is understandable, the same concern also naturally tends to lessen objectivity. Objectivity is essential when a teacher's reputation and livelihood are at stake, and Mr. Gowen could have assured objectivity if he had abstained or disqualified himself from the vote.

To dismiss a teacher on the basis of uninvestigated complaints and unverified rumors and to admit that the decision does not depend on the truth or falseness of the complaints and rumors is patently unjust, arbitrary, and capricious. If the possibility, let alone the probability of the truth of the facts involved is not known, a decision cannot be reasoned or based on substantial evidence. The implications of such a decision are frightening. It means that any student with a personal dislike for a teacher could bring his career to an end by a complaint wholly unjustified and unsubstantiated in fact. In the same sense, a malicious group in the community could start unsubstantiated rumors resulting in dismissal. Further, an administrator or another teacher bent on a personal vendetta could, by insidiously starting false rumors, bring about the dismissal of a totally innocent teacher.

It is to be noted that the decision not to renew was not based on improper conduct or for a bad reputation, but because plaintiff had "lost his effectiveness as a teacher in the district."[1] The evidence that the plaintiff had lost his effectiveness as a teacher in the district is non-existent. Superintendent Tufts unilaterally decided, and the School Board agreed, that the plaintiff had lost his effectiveness. The Princi-

pal of FMRHS, the only administrator who had talked both with the plaintiff and the girls and the only administrator in day to day contact with what was happening in the school, recommended that the plaintiff be renewed. Mr. Willis, and the teachers at the school who testified, including Miss LaBrie, the head of the plaintiff's department, did not believe that the plaintiff had lost his effectiveness. Certainly, Mr. Willis and Miss LaBrie were in a more advantageous position to judge the plaintiff's effectiveness than the superintendent and School Board.

In short, the action by the superintendent and the School Board, without even minimal investigation and without any concern for the truth, presents a classic case of a violation of due process. As stated by the Supreme Court in Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956):

> There has not been the "protection of the individual against arbitrary action" which Mr. Justice Cardozo characterized as the very essence of due process.
>
> \* \* \* \* \* \*
>
> The State has broad powers in the selection and discharge of its employees, and *it may be that proper inquiry would show [the teacher's] continued employment to be inconsistent with a real interest of the State. But there has been no such inquiry here.* Id. at 559, 76 S.Ct. at 641. [Emphasis added.]

*Drown, supra,* holds that a hearing is not required for a non-tenured teacher. I do not construe it to hold that a School Board has an absolute right to dismiss a teacher without an inquiry or a proper inquiry to determine if legitimate grounds for dismissal exist. To hold that a superintendent and a

---

1. Certainly, if the School Board and the superintendent thought that the plaintiff was making improper sexual advances on female students and the rumors of prior immoral behavior were true, the most logical step would have been immediate dismissal. This procedure would have required, however, that a full and fair hearing be held. See N.H.Rev.Stat.Ann., Ch. 189:13.

School Board need make no inquiry as to the truth or falsehood of the facts underlying the reason proffered for dismissal would offend the most elemental concepts of justice.

Because the reason given by the Board for the plaintiff's dismissal is patently arbitrary, the inference is overwhelming that the action of the superintendent and the School Board was motivated primarily by the plaintiff's exercise of his constitutional rights of freedom of speech and association. The complaints by the three girls, all friends and one the daughter of a School Board member, the resultant rumors of past misconduct, and the telephone inquiries presented a convenient opportunity to the School Board and superintendent to comply with the March 15 statutory notice of non-renewal deadline and to rid themselves of an outspoken teacher who had criticized the superintendent and the Board in the press as well as at the school. The decision not to renew plaintiff's contract for the 1970–1971 school year violated his rights under the First and Fourteenth Amendments of the Constitution.

### DAMAGES

■ The defendants contend that their common-law immunity prevents the plaintiff from recovering damages. I hold that as far as the equitable prayer for relief is concerned, common-law immunity does not apply. See Gouge v. Joint School District No. 1, *supra*. Assuming, but not deciding, that good faith prevents the imposition of compensatory damages for back pay, I cannot hold that the defendants here acted in good faith.

■ The plaintiff's uncontroverted testimony was that his salary would have been $7,650 for the school year 1970–1971 and that he lost at least one-third of his salary, or $2,550, as a result of being unemployed until December of 1970. The wages earned as a short order cook for the two weeks in the summer should not be deducted because there was no evidence that summer employment was prohibited by the School District. There was no medical evidence that the plaintiff had any pain and suffering nor was there any evidence on the extent to which his reputation in his community was damaged. Monetary damages for pain, suffering, and damaged reputation would, therefore, be wholly speculative. I am also of the opinion that punitive damages are not warranted.

Accordingly, the following order shall be entered:

(1) The decision of the defendant School District by its School Board members and its superintendent not to renew plaintiff's contract for the 1970–1971 school year violated the First and Fourteenth Amendments of the Constitution and is hereby declared null and void;

(2) The plaintiff is entitled to all the benefits of a 1970–1971 contract and is to be reinstated in the Fall Mountain Regional District forthwith;

(3) The decision not to renew plaintiff's contract is hereby expunged from plaintiff's record and the defendants are hereby restrained and enjoined from giving any effect to, or making any use whatsoever of, the decision not to renew herein declared null and void; and

(4) Judgment is entered for the plaintiff against the defendant School District, and individually against Stanley B. Tufts, Gordon Gowen, Paul F. Marx, Paul S. Cray, Robert C. Metcalf, and Newell E. Bishop in the amount of $2,550, plus the costs of this action. Assistant Superintendent Bellevance and the other members of the School Board named as defendants are excluded from this monetary judgment because they took no active part in the decision not to renew.

So ordered.