**Morris J. STARSKY, Plaintiff,**

v.

**Jack R. WILLIAMS et al., Defendants.**

**No. Civ. 70–309 PHX.**

United States District Court,
D. Arizona.

Dec. 26, 1972.

Alan M. Kyman, Phoenix, Ariz., for plaintiff.

Gary K. Nelson, Atty. Gen. of Arizona, by Howard P. Leibow, Sp. Asst. Atty. Gen., Phoenix, Ariz., for defendant State of Arizona.

J. Mercer Johnson, Tucson, Ariz., for defendant James Elliot Dunseath, in his individual capacity.

Nicholas Udall, Jennings, Strouss & Salmon, Phoenix, Ariz., for defendant Jack R. Williams, in his individual capacity.

Olgerd W. Kalyna, J. Mercer Johnson, Phoenix, Ariz., for Board of Regents of Universities and State College of Arizona and defendants comprising said Board.

## OPINION and ORDER

MUECKE, District Judge.

Plaintiff has filed this action under the Civil Rights Act, 42 U.S.C. 1981–1985, alleging that his termination as an assistant professor at Arizona State University violates his federal First and Fourteenth Amendment rights.

Plaintiff and defendants have both moved for summary judgment. Each has filed factual statements in accordance with our Court's Local Rule 11(h) [see Appendix for text]. The statements show no genuine issue of material, specific fact.

Plaintiff's basic attack is upon the decision of the Arizona Board of Regents, as shown in the Board's minutes of June 10, 1970.[1] The members of the Board who took part in that dicision have submitted an affidavit[2] to the effect that their decision is based " . . . upon a review of the transcript of hearing and exhibits presented before the Committee on Academic Freedom and Tenure at Arizona State University . . . " Defendants' motion for summary judgment depends on " . . . the complete Transcript of Record, including all exhibits, of the hearing before the Committee . . . " Plaintiff's Rule 11(h) statement also relies on the Committee transcript.

This Court issued an order on July 18, 1972 stating that this case is ready for final judgment on the merits on the issue of liability. The parties were given additional time to file any further pertinent documents. Additional documents were filed, and neither party took issue with this Court's characterization of the posture of the case. This Court, therefore, can now decide this case on the issue of liability. Should the plaintiff prevail, the issues of damages would be tried later.

Throughout the proceedings to date, neither side has suggested the existence of any additional evidence pertinent to the issue of liability. Although we are dealing with cross-motions for summary judgment, the case in view of the foregoing is now in the posture of an agreed statement of facts.

The termination of plaintiff's employment is the culmination of lengthy hearings, voluminous evidence and formal charges, findings, resolutions, and examination and cross-examination by attorneys during administrative hearings.

Plaintiff admits that not every act he is accused of is constitutionally protected, but he argues that his discharge is principally based on an impermissibly restrictive view of his First Amendment rights. Defendants argue that the Board of Regents acted within its lawful discretion in dismissing plaintiff for a series of unprofessional acts, and for speech which loses constitutional protection in that it amounts to a verbal act, or lacks professional restraint and accuracy.

■ The plaintiff having raised a constitutional issue, this Court must now make "an independent examination of the record . . . in order that the controlling legal principles may be applied to the actual facts in the case." Pickering v. Board of Education, 391 U. S. 563, 579, 88 S.Ct. 1731, 1740 Footnote 2, 20 L.Ed.2d 811. Great weight will be given to the findings of the Board of Regents where such findings were " . . . reached by correct procedures and supported by substantial evidence. . . . " Ferguson v. Thomas, 430 F.2d 852, 859 (5th Cir. 1970).

The record shows that on January 14, 1970, Professor Starsky absented himself from a regularly scheduled class at Arizona State University and attended a rally in front of the Administration Building at the University of Arizona, where he was one of eight or ten speakers protesting the arrest of certain students of the University of Arizona. The entire incident attracted a considerable amount of public attention, (Tr. Peek, 820 ln. 19–821 ln. 2) and undoubtedly was the incident which caused disciplinary actions to be initiated against the plaintiff.

---

1. All Board minutes referred to here are part of Exhibit A attached to defendants' motion for summary judgment.

2. Exhibit B attached to defendants' motion for summary judgment.

The January 31, 1970 minutes of the Board of Regents show the following resolution:

> The Arizona Board of Regents recognizes and supports the principle that when a faculty member speaks or writes as a private citizen, he should be free from institutional censorship or discipline. The Board is also mindful, however, that a faculty member's special position in the community imposes upon him the particular obligations and serious responsibilities of conducting his behavior and activities in the best interests of the university and his profession.

> The Board instructs the President of Arizona State University to institute proceedings in accordance with due process and university procedures to recommend what appropriate disciplinary action, if any, should be taken in regard to Assistant Professor Morris J. Starsky including whether his appointment be renewed or terminated.

An Ad Hoc Committee was appointed consisting of Arizona State University professors. This Committee met, deliberated, and prepared a report.

On February 21, 1970, portions of the report of the Ad Hoc Committee were read at a meeting of the Board of Regents. The report[3] recommended against instituting proceedings for dismissal as it " . . . does not have sufficient evidence to warrant formal proceedings concerning dismissal." The report included a letter from the local chapter of the American Association of University Professors, including the following statement:

> Failure to meet a class even for an illegitimate reason is not in and of itself sufficient reason to recommend formal proceedings . . . .

The Board of Regents, nonetheless, voted to order that hearings be instituted. Pursuant to this order, the administration of the University drew up formal charges which were mailed to plaintiff on March 4, 1970. The Committee on Academic Freedom and Tenure (hereinafter called the Committee) was convened to preside over the hearings pertaining to these charges. Between March 24, 1970 and April 29, 1970, the Committee, consisting of six Arizona State University professors, held thirteen open hearings at which attorneys for both plaintiff and the administration examined twenty-one witnesses. The Committee spent in excess of 100 hours in work sessions.[4] The Committee then filed a fourteen-page "Findings, Conclusions, and Recommendations."[5]

The charges against plaintiff are set forth in the transcript of the Committee's hearing. There is a "summary charge" stating in part that as measured by the American Association of University Professors (hereinafter called A.A.U.P.) 1940 Statement of Principles on Academic Freedom and Tenure, plaintiff has "failed to act responsibly as a member of the teaching profession, has willfully violated Regents' policies and University regulations, has not exercised appropriate restraint as becomes a university professor in his public activities . . ."

The A.A.U.P.'s principles by which the charges were to be judged are set forth as approved by the Board in its June 10, 1970 meeting:

> The college or university teacher is a citizen, a member of a learned prosession, and an officer of an educational institution. When he speaks or writes as a citizen, he should be free from institutional censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and an educational officer, he should remem-

---

3. Second supplement to defendants' motion for summary judgment.

4. Memorandum Exhibit A to supplement to defendants' motion for summary judgment.

5. Supplement to defendants' motion for summary judgment.

ber that the public may judge his profession and his institution by his utterances. Hence he should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that he is not an institutional spokesman.

The "summary charge" is supported by five "general charges" and the "general charges" are supported by a number of "subcharges," eleven of which refer to specific incidents. Evidence was adduced as to eight of the specific instances. Of these eight, the Committee found that five of the charges were either unsubstantiated by the evidence or involved constitutionally protected conduct.

Charge I involves failure to exercise "appropriate restraint" in transmitting knowledge, and is supported by one incident of handing out a letter to faculty members on campus. The Committee found this incident " . . . within the area of free discussion . . . ."

Charge II states a failure to observe university regulations and is supported by evidence of two incidents—a cancellation of one class, and a speech at the University of Arizona.

The Committee found the class cutting a violation of University policy, but found that the speech did not violate A. A.U.P. standards.

Charge III involves failure to show respect for the opinions of others. It is supported by evidence of two incidents charging abusive speech to specific persons on campus and two incidents of public utterances. The Committee found as to the four incidents that (1) plaintiff was abusive to a Mr. Warren Sumners; (2) his remark concerning the engineering staff "does not constitute an insult by normal standards"; (3) he was "inaccurate as to a legal matter" in a television broadcast; and (4) a press release was constitutionally protected.

Charge IV alleges a breach of A.A.U. P. principles regarding student-faculty relations and is supported by evidence of one specific incident of having "urged and encouraged" students to occupy the Administration Building. The Committee found that "The evidence does not substantiate this charge."

Charge V accuses plaintiff of failure "to further public understanding of academic freedom" and is supported by a number of broad subcharges containing equally general wording about an alleged course of conduct from 1964 to 1970 causing public censure of the University. No specific acts are stated. The Committee found that public censure was caused in large part by objection to plaintiff's "political and social views," and found no evidence of additional wrongdoing. The Committee found that plaintiff's failures were "not sufficiently grave to warrant a finding that his services . . . have been unsatisfactory." The Committee concluded:

. . . we now find on the basis of the present record inadequate grounds for dismissal . . . .

Arizona State University President H. K. Newburn then wrote a letter to the Board of Regents recommending some sanctions less than dismissal.[6]

The minutes of the Board's meeting on June 10, 1970 show that the members read the transcript and exhibits and the Committee recommendations. No discussion of the evidence or recommendations is shown. The Board concluded:

This Board finds and concludes that Dr. Starsky did indeed do substantially all the acts and deeds with which he is charged (except as to three specified activities as to which no evidence was offered and except that instead of initiating, urging and encouraging the incident of November 20, 1968, Dr. Starsky supported and participated in such incident in violation of the Regents' ordinance).

In addition, the Board specifically finds that Dr. Starsky, by his own

---

6. Exhibit B to supplement to defendants' motion for summary judgment.

testimony, would not consider himself bound in the future to obey or enforce the rules and regulations of the University and this Board.

Accordingly, this Board further finds and concludes from the evidence and from the aggregate thereof, that Dr. Starsky has been guilty of substantial, wrongful, and prejudicial acts of professional misconduct, of substantial violations of the principles above quoted, intemperate and unrestrained behavior, inaccurate and misleading statements, and general unfitness for a position with the faculty at Arizona State University, which is the core of the separate specifications with which he was charged.

It is therefore the judgment of the Board that the interests of education in the State of Arizona require that Dr. Starsky no longer be permitted to teach on the campuses under the jurisdiction of the Board.

Thus, the Board found a basis for discipline in all of the charges and all of the eight specific incidents on which evidence was given. This was contrary to the Committee's findings of support for only three of the specific charges, i. e., the insult to Mr. Sumners, a cancelled class, and an inaccuracy in a television broadcast.

■ The Board gave no indication of the reasons or the evidence it relied on in its disagreement with the Committee. Thus, this Court is in the unusual position of having on the one hand what amounts to detailed findings of fact and conclusions of law from a faculty committee which conducted the actual hearings and found that infractions were not sufficiently serious to find plaintiff unfit, or to warrant his discharge; and having on the other hand, only a bald statement of conclusions by the Board of Regents to support its determination of "unfitness." Comity commands us to support the Board's conclusions if they are supportable by any reasonable inference from the evidence. The summary nature of the Board's conclusions handicaps us, however, in discovering the ba-

sis for the Board's rationale. Both the Committee and the Board based its conclusion upon the same evidence which this Court now has before it. Since out of the eight specific charges on which evidence was received, seven are based in whole or in part upon the spoken or written word outside of the classroom, it now becomes our duty to make the independent factual findings necessary in this kind of constitutional case. To do this, we must examine the evidence in some detail.

Charge I, *"Professor Starsky has failed to exercise appropriate restraint or to exercise critical self-discipline and judgment in using, extending and transmitting knowledge"* (Tr. 9 ln. 4–7) is supported by only one specific charge to the effect that in May 1968, plaintiff distributed to "faculty members entering the Great Hall, College of Law, mimeographed copies of an open letter from a student of Columbia University to the President of Columbia University, having in content no pertinence to facts or conditions at Arizona State University and including an objectionable quotation drawn from the prose work of LeRoi Jones, 'up against the wall, m___f___,' with the intent to promote disaffection and disloyalty . . . between the faculty and the Administration at Arizona State University."

Administration Exhibit 1 is an inaccurate copy of the letter in that Exhibit 1 has a handwritten note on the upper left hand corner. This note was included in a copy of the letter sent to only one person. The letters which were handed out at the entrance to the Great Hall, and which are the subject of the charge contain no such notation. There was no evidence as to any disorderly conduct in the physical handing out of the letter or any specific instances of disaffection or ill effect resulting from the letter which occurred at the time of distribution. The Administration's evidence of culpable motivation is based entirely upon the bare words of the letter itself. Thus, an Administration witness found the letter ob-

jectionable because the issues at Columbia were not pertinent to Arizona State University and because the quoted vulgarity was "out of keeping with the, if not sanctified, at least the austere surroundings of a faculty meeting." Professor William Harris, who wrote a petition objecting to the letter (Administration Exhibit 3) states that his petition is based on language showing "complete disrespect for authority, which is the real message here, is just accentuated by the last lines." There was no reprimand, official or otherwise, issued to Professor Starsky based on this incident.

Thus, if Charge I is to be supported, the support must come from the wording of the letter itself. The letter headed "the Issues at Columbia University" consists of quotations of a dialogue between Columbia University President Grayson Kirk and a student leader, Mark Rudd. The basic thrust of the letter is President Kirk's accusation therein that young people have taken refuge in ". . . nihilism whose sole objectives are distruction.", and Mr. Rudd's denial of the charge and assertion that young people have ". . . positive values . . . we are seeking a rational basis for society. We do have a vision of the way things could be. . . ." Mr. Rudd goes on to advocate socialism which will be accomplished by taking power away from people like President Kirk and giving this power to others, thus: "For if we win, we will take control of your world, your corporation, your university and attempt to mold a world in which we and other people can live as human beings." However, there is nothing in the letter which calls for any kind of immediate action at Arizona State University, nor is there any analogy drawn between the conditions at Columbia and those at Arizona State University. The quotation from Mark Rudd ends with a strongly worded quotation within a quotation, thus:

> You call for order and respect for authority; we call for justice, freedom and socialism. There is only one thing to say. It may sound nihilistic to you, since it is the opening shot in a war of liberation. I'll use the words of LeRoi Jones, whom I'm sure you don't like a whole lot: 'up against the wall, motherfucker, this is a stick-up'.

This Court adopts the Committee's findings and conclusion as to Charge I, since they flow inevitably from the evidence. This Court particularly stresses the Committee's Finding No. 4 that the letter was "distributed peacefully;" and Finding No. 5 that "There is no showing that Professor Starsky's intent was to promote disaffection and disloyality rather than to acquaint the faculty with causes of student unrest at Columbia generally;" and the Committee's conclusion that

> The distribution of the Rudd leaflet was not improper under the circumstances. It is our opinion that such a distribution by one member of the academic community to fellow faculty members is within the area of free discussion if the distributing faculty member believes that he can perform an educational function in this manner and if he makes the distribution peacefully, in a nonobjectionable manner.

The incident concerning the Rudd letter occurred in May 1968, prior to the time that plaintiff was given his fifth year contract. A fifth year contract at Arizona State University gives a professor "stability of contract" which is generally accepted by faculty and administrators as Arizona State University's form of tenure. Administration Exhibit 16. Plaintiff's fifth year contract commenced in the fall of 1968.

■ Insofar as the Board's finding that Professor Starsky did substantially all of the acts he is charged with applies to Charge I. involving an alleged failure to use self discipline in transmitting knowledge, said finding has no substantial support of any kind in the record, and this Court must therefore reject it.

■ Charge II, *"Professor Starsky has failed to observe University regu-*

*lations"* is supported by evidence relating to two specific subcharges, reading in pertinent part:

On January 14, 1970 Professor Starsky having knowledge of the lawful regulations of the Arizona Board of Regents, which it was his duty to obey, cancelled a regularly scheduled class at Arizona State University.

On January 14, 1970 Professor Starsky with intent to create a disturbance against and disrespect for the lawful administrative authority of the University of Arizona appeared before and spoke to a group of students assembled on the campus of the University of Arizona to protest the arrest of eight University of Arizona students for engaging in an alleged riot and to demand the resignation of President Richard Harvill and of Vice President Robert C. Houston and exhorted and encouraged those assembled students to defy the administrative authority of the University of Arizona.

The evidence shows that plaintiff did cancel a class for the purpose of making a political speech at the University of Arizona, but that he informed his department chairman informally of his intention to cancel the class. Nowhere in the record is there any "regulation" as such set forth which specifically forbids this kind of conduct. In fact, Professor Arner, Chairman of the Philosophy Department, testified that Professor Starsky was not breaking any department rule in cancelling the class since there was long standing autonomy in this connection. Tr. Arner 738 ln. 24 and 741 ln. 13–15. The evidence is uncontradicted that plaintiff is extremely conscientious about meeting classes, even going to class when he can hardly talk.

Dean George A. Peek, Jr., the Dean of Liberal Arts, did write plaintiff a letter of reprimand concerning the class cutting incident. Administration Exhibit 13. Dean Peek's letter does not refer to a specific rule or regulation but rather to a general "policy of the Board of Regents, confirmed in my letter of October 25th and again on November 6th, 1969 which states that 'classes are expected to be held according to the official academic calendar . . . .'" These "policy" letters discussed in the letter of reprimand involved a decision by the faculty that classes should not be dismissed for political reasons during the moratorium of November 1969. Tr. Peek 791 ln. 17, 792 ln. 7.

The specific purpose of Dean Peek's "policy" letters was disobeyed by a teacher, who had cut a class to attend the moratorium. This moratorium incident was handled by a reprimand from a department chairman, whereas in plaintiff's case, the cutting of a class became the basis for formal charges, and a "rather prestigious" six-man committee was elected to consider the charges Tr. Peek 820 ln. 5–16.

In his testimony at the hearing, Dean Peek explained the reason for the difference:

It was different because in the second case the president and vice-presidents said they thought this was of such magnitude that it required that the dean take an action. Normally in dealing with faculty I think the best way is to operate through the chairman BUT THIS WAS CONSIDERED A CASE THAT HAD COME SO MUCH IN THE PUBLIC EYE. THE FIRST CASE DID NOT ATTRACT, TO MY KNOWLEDGE, ANY PUBLIC ATTENTION. (Emphasis supplied.)

There was uncontradicted evidence that somewhat casual cancelling of classes by teachers is not uncommon on occasion at Arizona State University. There is no indication of what "Regulation" plaintiff's speech at the University of Arizona violated, unless we are again talking about a general "policy" in favor of keeping class appointments. No evidence of action or manner other than the words of the speech itself was offered to support the charge that plaintiff spoke "with intent to create a disturbance against and disrespect for the lawful administrative authority" or that

he demanded the "resignation of President Richard Harvill and Vice President Robert L. Houston and exhorted and encouraged those assembled students to defy the administrative authority of the University of Arizona." The words of the speech preserved by a tape recording of the speech, directly contradict these charges. Professor Starsky was one of eight or ten speakers protesting the arrest of certain students and attempting to force cancellation of athletic relations between the University of Arizona and Brigham Young University.

Professor Starsky also expressed his own general philosophy concerning socialism and law and order, making it clear that he was not an administration spokesman. Although he advocated dramatic social change, he did not urge that the group before him take any specific or immediate violent or personally disrespectful action. He did not demand anyone's resignation.

The Administration's own observer at the University of Arizona rally testified, "The whole tenor of the rally was non-violence. There was nobody at any time of any of the speakers who urged any type of violence." Tr. 359 ln. 12–17. The Committee had no choice but to conclude, "Professor Starsky's speech of January 14, which neither advocated violence nor resulted in violence, . . . did not clearly violate the limits on extramural utterances set forth in AAUP standards."

This Court finds that the Committee correctly concluded that plaintiff's cancellation of a class on January 14, 1970 is a violation of university "policy" but further finds that the incident was an isolated one and that plaintiff's record in following the university policy in favor of meeting class schedules is otherwise excellent. Further, the violation is of a kind which the Administration ordinarily ignores or handles by a low level reprimand. The Board in ordering formal charges based on so minor and isolated a violation, is *selectively enforcing* its general attendance policy against Professor Starsky. This Court finds no

evidence of misconduct in the University of Arizona incident and we can find no credible basis for the Board's rejection of the Committee's finding that Professor Starsky's speech at the University of Arizona did not violate A.A.U.P. standards. Neither the class cutting nor the University of Arizona speech supports the general charge of failure to observe university regulations for the further reason that the general "policy" involved here is not a specific "regulation" but merely a general statement of attendance policy which plaintiff had always obeyed except for this one incident.

A review of the entire record finds no support for the Board's upholding Charge II, there being no substantial evidence that plaintiff failed to observe university regulations.

■ Charge III states in part: *plaintiff "has failed to show respect for the opinions of others or to be objective in his professional judgment of colleagues."* It is supported by four specific charges consisting of two charges of verbal abuse of individuals, i. e., of Warren K. Sumners, and of members of the College of Engineering faculty; and two charges relating to public off-campus speech, i. e., a "false statement" in a television broadcast involving "his employers, the Arizona Board of Regents.", and a press release made "with disrespect toward his employers, the Arizona Board of Regents."

The evidence clearly supports the Board's finding that Starsky did do the act involved in the subcharge involving Mr. Sumners, i. e., "On April 9, 1968, on the occasion of a memorial service for Dr. Martin Luther King, Jr., Professor Starsky subjected Mr. Warren K. Sumners, Assistant Managing Director, Gammage Auditorium, to verbal abuse and insult." The evidence shows that plaintiff called Mr. Sumners a " . . . bastard, you're a son of a bitch, you have such a little regimented mind I bet you even screw on schedule." In mitigation, however, the evidence shows that plaintiff is truly contrite and apologetic about this incident and

that plaintiff admits he lost control under the stress of intense emotion due to Martin Luther King's death.[7]

Although Mr. Sumner wrote a complaint about Professor Starsky, and sent it through administrative "chain of command" there was no response, and no formal reprimand or discipline was initiated at any time until the present charge was sent to plaintiff in March of 1970, almost two years after the incident.

Further, at least one of the many discussions leading to plaintiff's fifth year contract, giving him "stability of employment", occurred in the summer of 1968, some time after this notorious Sumner incident. So that again Professor Starsky is charged with the doing of a known act which occurred *before* he was given renewal of his contract and stability of employment.

Dean Peek, Dean of Liberal Arts, testified as to this discussion:

. . . the Vice President of Academic Affairs talked to Prof Arner and me and said, "You're aware that when Prof Starsky gets his fifth year contract this constitutes stability of employment.?" We said we were clearly aware of this fact and that we had recommended the fifth year contract with the idea that he would achieve stability of employment.

I think that was an important decision. And we're aware of some of the things that had gone on.

The subcharge of verbal abuse of members of the College of Engineering has no support in the record. There was a dispute between certain students, who insisted upon posting anti-war literature on the Engineering Building bulletin board, and the Dean of the College of Engineering, who denied permission for the posting. Many fraternity notices and other non-controversial notices were posted on the board. Professor Starsky was one of three professors who

pointed out that there might be a violation of free speech in barring the entrance to a public building. At one point, Professor Starsky asked John Duffy, Director of Security, "Can I make a citizen's arrest of that man?" referring to Dean Welch. Tr. Duffy 441 ln. 5. When John Duffy informed plaintiff that he did not know, the matter was not pursued further. The Administration witnesses all denied abusive language. Dean Welch testified, ". . . there was not what I would consider abusive language. . . ." John Duffy testified, "I would say no, I wouldn't say he was abusive. I make an assumption he was asking legal advice which I couldn't answer." There was no other evidence of verbal abuse at the engineering incident, and this Court therefore adopts the Committee's finding that plaintiff's question "does not constitute an insult by normal standards." The Board's finding that plaintiff did the acts accused of in this incident is without any support in the record.

There is further uncontradicted evidence that plaintiff " . . . definitely calmed things down, without a doubt," and stopped an ugly situation from developing during the course of this incident. After the building was locked, Starsky dissuaded students from breaking into the building. He advised them that there was no sense in getting arrested or causing trouble, and that it would be better to handle the matter through the courts or the student disciplinary committee.

The evidence involved in the television broadcast and the press release consists principally of the words used in these utterances, as they appear in Administration Exhibits 14 and 17 respectively, and they are set forth in full in the appendix herein. The Board in finding that these charges were true, had to find both statements involved "disrespect" toward plaintiff's employers, the Board of Regents, and that the televi-

7. Can anyone forget the deep reaction to the murder of President John F. Kennedy, and then consider how this emotion was intensified in many by the next murder of a national figure, that of the Rev. Martin Luther King?

sion speech contained a "false statement by declaring . . . that the Arizona Board of Regents had no right or authority to question or in any way discuss his fitness for his faculty position." The Committee found that plaintiff made statements on television that were "inaccurate as a legal matter."

A.R.S. 15–725 gives the Board of Regents the legal right to remove plaintiff "in the interests of education." Plaintiff's speech questioned the Regents' "'right' to discuss either the matter of my failure to meet with a class on January 14 or my political views. . . ." Nowhere in the speech does plaintiff question the right of the Board to discuss any other aspect of his conduct, and thus the part of the charge stating that plaintiff denied the Board's right to "in any way to discuss his fitness" is clearly unsupportable. The gist of the whole television speech is that a professor is judged in terms of credit hours rather than class hours and that only students and faculty have the expertise to make this kind of judgment. Nowhere is the Board's legal authority discussed or inaccurately defined. Dean Peek understood the broadcast as merely expressing plaintiff's view of the academic community, a view with which the Dean agreed. There is nothing in the speech to indicate that plaintiff is discussing legal rather than moral rights. He nowhere refers to the law, or uses the word "authority." He does not hold himself out as knowledgeable in the law. Plaintiff claims that the "right" to judge class performance belongs to "students" and faculty. It would take an extremely strained reading of the television speech to find that this "right" claimed by plaintiff constitutes a false claim that the students have legal authority rather than moral right to judge a teacher. There is no substantial evidence to uphold the Board's finding of inaccuracy.

Whether the speeches show such "disrespect" as to go beyond protected criticism is a legal issue, but we also find as a matter of fact that although both utterances used strong terms, e. g., "arrogant, cynical and hypocritical," to describe the Board's action in ordering formal charges in the face of the Ad Hoc Committee's recommendation to the contrary, that none of the terms in either speech was directed to members of the Board personally, that both concerned matters of urgent personal importance and of general public interest, and there is no evidence of abusive language or personal disrespect as that term is ordinarily understood in relation to public discussion of contested issues.

Of the four subcharges which the Board found support Charge III, only the Sumner incident gives some support to the portion of the charge involving a failure to "show respect for the opinions of others." No evidence was offered to support the general charge of failure "to be objective in his professional judgment of colleagues."

Charge IV alleged that *"Professor Starsky has disregarded and breached American Association University Professors Principles of Professional Ethics and University Regulations regarding student-faculty relationships.* Charge IV is supported by only one incident for which evidence was received. The subcharge reads in part:

On November 20, 1968, Professor Starsky incited, urged and encouraged persons, including Arizona State University students, to occupy the office of the President of Arizona State University . . .

The Committee discussed the evidence on this charge in some detail and concluded, "The evidence does not substantiate this charge." The Board, nonetheless, in its minutes of June 10, 1970 found that plaintiff "supported and participated in such incident in violation of the Regents' ordinance," rather than "initiating, urging and encouraging."

Thus, the Board, although finding Professor Starsky guilty of general Charge IV, found him innocent of part of the main thrust of the one subcharge supporting Charge IV.

The evidence shows that on November 20, 1968, a rally was held on the Arizona State University Mall to protest allegedly discriminating practices in a linen supply company with which Arizona State University had a contract. Plaintiff did not attend the rally. At noon, about 200 persons, led by the Mexican-American Student Organization (an organization with which plaintiff was not associated) entered the open Administration Building, went to President Durham's office and asked to see the President. Upon being told that the President was out, they remained in the building waiting for his return. Professor Starsky appeared in the Administration Building later in the afternoon. He was then Faculty Advisor to the Young Socialist Alliance, two of whose members were present in the building. There was no damage to the building and at no time was it necessary to take police action. John Duffy, Security Officer, told the students that they would have to leave the building when it closed at 5:00 o'clock P.M. Although a number of administrators and professors were present in the building, there was no order or even suggestion that the students had to leave prior to closing time. The students had an understanding that if they left the building at its closing hour, they could return when it opened the next morning. A student leader made an announcement to this effect, and the Administration people present did not contradict him. Professor Starsky and a number of students then heard Vice President Cady say, "You can't have them here tomorrow." Professor Starsky called out, "Cady is copping (or selling) out." There was then a consultation between Mr. Cady and Professor Landini, and the "deal" permitting return the next morning was promptly confirmed. When plaintiff learned that some of the students planned to stay after 5:00 o'clock P.M. in violation of security policy orders, plaintiff successfully advised against this and asked that "when the building was closed, when business hours came to an end people would leave." The students left before closing time.

The next morning, a group returned at 9:00 o'clock A.M. and a meeting was arranged with President Durham, and most of the students agreed to leave the building at about 10:30 o'clock A.M. Some of the more militant students refused to leave, and a tense situation resulted. There is cumulative, uncontradicted testimony that at this point, there would have been real danger of violence if the few dissident students had attempted to force a confrontation, and that Professor Starsky urged these students to leave. Professor Starsky obviously swayed them, he "cooled off the students," and within five or ten minutes, everyone left.

Administration witnesses were repeatedly asked to name specific acts that Professor Starsky performed at the Administration Building. Aside from the outburst after Mr. Cady's remark, the only specifics are that Professor Starsky spoke to the students urging unity, and that he helped to clear the aisles in order for persons to be able to get into the President's office for routine business. An Administration witness described his conduct as "quite cooperative, and he did what he could, I think, to remedy the situation."

Professor Starsky's evidence that he went into the building as an individual and that as an individual, he attempted to keep things orderly, to let traffic go through, and to keep the situation peaceful is amply corroborated by the record. The Committee found that plaintiff's outcry, "Cady is copping out" is subject to criticism, but "his leadership on November 21 in preserving a peaceful solution was commendable."

We agree that the outcry may have been tactless, although in the vernacular used and understood by the young, but in view of the entire record of plaintiff's role as a peacemaker, we are forced to believe Professor Starsky when he says, " . . . my exhortation was to the effect of having the mat-

ter cleared up. I didn't want to start a riot." The outcry did in fact result in an immediate discussion with agreement reached between students and Administration and no violence resulted.

The only evidence concerning a regulation that may have been broken by students "occupying" the building did not apply to plaintiff since faculty advisors are not responsible for students' actions, and it is clear that Professor Starsky did not in any way initiate the occupation of the building.

Although Charge IV and the Administration Building subcharge do not deal with a "violation of the rights of ordinance," the Board found plaintiff's conduct on November 20, 1968 did in fact violate such an ordinance. It cannot be determined to which ordinance the Board is referring. Since this Administration Building incident is the only specific charge on which evidence was received in support of Charge IV, this Court is at a loss to discover which regulation was violated in the Board's finding a breach of ". . . university regulations regarding student-faculty relationships." Further, the evidence of the relationship between plaintiff and the students shows a faculty member whose close rapport with the student is such, that on two occasions during the incident described, as well as during the Engineering Building incident, Professor Starsky was able to dissuade students from dangerous action by the mere use of peaceful logic.

This Court, therefore, finds that there is no substantial evidence to support Charge IV.

Charge IV and Charge II involving a breach of policy in cancelling one class are the only charges involving failure to observe rules and regulations, and the only charges which by their terms purport to support the summary charge that plaintiff "has *willfully* violated Regents' policies and University regulations." (Emphasis supplied.) These charges are also the only indirect notice given to plaintiff for the Board's further finding that he "would not consider himself bound in the future to obey or enforce the rules and regulations of the University and this Board." None of the charges dealt directly with Professor Starsky's future plans. The Board's finding that plaintiff did not consider himself bound to "enforce" rules has some vague support in general philosophical pronouncements by plaintiff. However, none of the charges against Professor Starsky give him the vaguest notice of a duty to "enforce" rules, or a violation of such duty, and this Court can find no evidence of any expressed intention on the part of plaintiff to disobey any specific, clearly defined rule or regulation setting forth a duty that he "enforce" rules.

There is no substantial evidence to support the Board's finding that Professor Starsky intends to violate rules and regulations in the future. The evidence is clearly to the contrary, thus:

Q. Then what you're saying is that the entire regulatory system of the university, the rules, the regulations are tainted because they are based upon war making and racist policies? A. Of course. Every university. Q. Then since they are tainted you are at liberty to violate them if you feel that the contra interests are paramount? A. No. We are at liberty to challenge them, try to change them, try to bring about a mass educational attempt and mass protest to show that there was any contravailing force on the other side. I don't think that people, individual people are at liberty to break rules and regulations.

At another point, Professor Starsky was again asked whether his concept of the University exempts him ". . . from supporting the rules and by-laws which you accepted when you accepted your contract?" The plaintiff answered, "It doesn't exempt me from supporting these rules, if by supporting you mean giving prudential obedience to. You know, you have got to be uncool to do that, . . . ." Professor Starsky then stated that he found nothing God given or holy about the rules, "But that

doesn't mean you go around breaking them or violating them. You're prudential and you look forward to a day when society will be different, and be organized in a different way, and you will have different rules. . . . And one does his best, hopefully, within the framework that he's living in to make that day come a little bit closer."

■ Charge V is headed *"Professor Starsky has failed to meet his obligations to promote conditions of free inquiry and to further public understanding of academic freedom."*

This Charge is supported by a series of other general charges involving a course of conduct said to have occurred between 1964 and 1970. There is no specific evidence of any conduct supporting Charge V other than the evidence already discussed in the preceding charges, the earliest incident having occurred in 1968. Evidence relating to Charge V consists entirely of the effect that plaintiff's conduct had on others.

There is no doubt from the evidence that when plaintiff engaged in conduct that people disagree with, and there is a television or news paper report of such conduct, that there is a wave of protest. There is also no doubt that fears were expressed that the Legislature might reduce funds in order to censure and punish the University for Professor Starsky's misconduct.

The evidence was very unclear, however, as to whether public misunderstanding results from the fact that Professor Starsky is the only faculty member who is a "self-admitted publicly acknowledged Marxist socialist" or whether such misunderstanding results from Professor Starsky's conduct, or from sensationalized media reports of Professor Starsky's conduct.

The Committee quite accurately found "A professor's conduct should be judged in terms of its propriety, not in terms of whatever distortion may be created in the minds of the public. Thus we conclude that Charge V cannot be read apart from the other charges." The

Board's finding of culpability based on Charge V has no substantial support in the record.

In determining whether the Board's summary "general unfitness" for a position with the faculty is supported by substantial evidence, we must consider the overwhelming evidence of plaintiff's abilities and dedication as a teacher and a scholar.

The Committee on page 12 of its findings, listed "Other Findings," reading in part:

1. Testimony was given by Professor Starsky's department chairman and his dean that Professor Starsky is a superior teacher both in the classroom and in time devoted to students outside the classroom; that he has promise for scholarly achievement; and that he has rendered service to Arizona State University in conceiving, planning and administering an annual national conference on philosophy. . . ."

The Committee's finding is well supported by the evidence.

Plaintiff's faculty supervisors spoke of his abilities in glowing terms, classifying him as one of the best teachers, one of the top ten percent of teachers on the campus, as working sixty hours a week, and as a professional philosopher of national visibility. A full professor even suggested that faculty members be required to take one of Professor Starsky's courses.

■ We find that in view of plaintiff's seven year record of excellence as a teacher, the fact that he achieved stability of contract, and that the only specific charges supported by substantial evidence involve a pre-tenure personal abuse of Mr. Sumners and an isolated instance of class cancellation in which "policy" was selectively enforced, and that the only reprimand he received was for this one incident of class cutting, that the Board's conclusion of ·"general unfitness" does not find substantial support in the record.

Our finding that the evidence is not sufficient to support the basic charges or to warrant termination is not sufficient in itself for plaintiff to prevail since we do not normally review matters within the Board of Regent's discretion. The paucity of unprotected cause for dismissal will only become significant if we also find that the primary or substantial cause of the discipline is an impermissible restraint on plaintiff's constitutional rights.

■ The issue of whether the employee teacher in this case was wrongfully discharged by the employer Board of Regents is complicated by the mixture of reasons given for his discharge, some clearly involving the teacher's constitutionally protected rights and others not. Since the conduct of the teacher which lead to his dismissal consists of both constitutionally protected and unprotected activities and speech, what must be determined is whether the primary motivation of the employer Board of Regents and their actual reason for the discharge was based on conduct which was constitutionally protected.[8]

The particular conduct of the teacher employee which lead to the discharge and the primary motivation and actual reason of the employer in discharging him is to be determined from all the facts and circumstances involved in his termination as disclosed by a reading of the entire record. It is not to be determined solely on the basis of the reasons given by the employer for the discharge. This is so because from a review of the entire record, it may become apparent that the facts do not support the stated reasons for the discharge. This may also be so because the selective enforcement of a policy or rule against a particular employee makes it clear that he alone among all employees is being singled out for discipline in such a singular, discriminatory fashion as to suggest that the enforcement of a policy or rule

against him is not the real reason or primary motivation for the discharge.

■ This is not to suggest that the mere intermingling by a teacher of constitutionally protected conduct (or speech) with other unprotected conduct (or speech) should be deemed to bar an employer from discharging that teacher. A claim of "free speech" should not excuse actions by a teacher that would normally evoke the kind of discipline applied in this case. Conversely, the employer should not selectively enforce rules, or use minor infractions as an ostensible reason for discipline or discharge in a case where the unprotected conduct complained of would normally evoke only mild disciplinary action or perhaps no discipline at all but for the protected conduct or speech.

■ However, if judged by constitutional standards, there are valid as well as invalid reasons for the discipline or discharge of a teacher, such discipline or discharge will not be set aside by the federal court so long as the invalid reasons are not the primary reasons or motivation for the discharge.

From the record in this case up to this point, it is determined that some of the charges against the plaintiff have no support in fact.

With respect to the remaining charges, the foregoing tests as to the protected and unprotected conduct of the plaintiff, and the tests for the determination of the valid or invalid reasons and primary motivation for his discharge by the employer will be applied to determine which of the parties' motions for summary judgment should be granted and whether the plaintiff's discharge should be affirmed or set aside.

Of the eight specific deeds which the Board found plaintiff did and which provide the basis for the Board's finding of unfitness and for discharge, only one concerns plaintiff's functions as a

8. See Vol. 1970 Wisconsin Law Review 162, Notes on Civil Rights—Academic Freedom, particularly ¶ B at 168, et seq., "Refusing to Rehire a Teacher in a Situation Where Both Constitutionally Permissible Reasons and Impermissible Reasons Are Present: A Problem of Selective Enforcement."

teacher, i. e., one unexcused class cancellation. All of the other charges involve extramural or public activity. In every specific charge, the written or spoken word plays an important or exclusive role.

As to the seven charges involving words, we must ask two questions: First, are the words subject to federal constitutional guaranty? Second, as to those charges involving speech as a citizen, are the words protected by the Board's own standards proclaiming that when a faculty member speaks as a citizen, exercising his constitutional right of free speech, he should be free of institutional discipline? The second question may be raised to constitutional significance, since plaintiff was given notice and repeated assurance throughout these proceedings that the charges against him would be governed by certain A.A.U.P. principles which appear in the bylaws of the faculty constitution. If the Board used standards substantially more restrictive than its avowed principles a serious due process question would be raised.

In determining whether the words involved are protected, we shall attempt to balance two basic interests. The United States Supreme Court has repeatedly emphasized that "The vigilant protection of constitutional freedom is nowhere more vital than in the community of American schools." Keyishian v. Board of Regents of U. of St. of N. Y., 385 U. S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). On the other hand, the courts have recognized that academic freedom may have to be balanced against school administrators' right to forbid conduct which would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." Tinker v. Des Moines Independent Com. Sch. Dist., 393 U.S. 503, 509, 89 S.Ct. 733, 738, 21 L.Ed.2d 731 (1969).

██ This balancing test is quite easy in the two incidents involving charges of personally insulting speech delivered on the campus within students'

hearing. Although the language used in the Sumner incident may be subject to sufficient First Amendment protection to defeat a tort or a criminal action, there are important considerations of school discipline here. The content of the speech in calling Mr. Sumner a "bastard," etc., adds very little to the world of ideas. It communicates only vituperation, bad temper, and a kind of loss of personal dignity on the part of a faculty member that may be the exact kind of conduct meant to be avoided by the A. A.U.P. standard of "appropriate" restraint. The school's interest in discipline in demanding some minimum of courtesy in a faculty member's on-campus relationships with school officials outweighs the free speech interests here.

██ The question asked by plaintiff as to whether he could make a citizen's arrest of a member of the faculty of the Engineering College does not involve the same kind of undignified conduct. The speech consists of an honest, if misguided, inquiry as to whether plaintiff could legally take a certain course of action. The evidence shows that plaintiff honestly believed that Dean Welch was performing an illegal act in refusing to permit the posting of an anti-war handbill, and that this belief was shared by other professors. It is significant that John Duffy, Director of Security, did not know the answer to the question, and that none of the Administration witnesses found the question abusive. The question was promptly dropped and there was no evidence as to any action. We find no issue of "verbal act." The interests of honest inquiry here outweigh the interests of discipline. We find this is protected speech.

██ The Administration Building incident is somewhat more complicated. The Board found culpability in an event covering a two-day period during which plaintiff was found to have supported and participated with students in the occupation of certain offices in violation of regulations concerning student-faculty relationships. We agree with the Committee that the evidence does not

support the charge, and like the Committee, we find aspects of plaintiff's conduct as a peacemaker most commendable. Plaintiff raises a further issue that the outcry, "Cady is copping (or selling) out," is protected speech. Defendants argue that this outcry under these circumstances was calculated to arouse a violent response and is therefore a "verbal act" within the meaning of Siegel v. Regents of U. of Cal., 308 F.Supp. 832 (D.C.1970). The facts supporting the finding of a "verbal act" in Siegel present an interesting contrast to Professor Starsky's outcry. Siegel was a student enrolled on the Berkeley Campus at a time that property belonging to the Board of Regents was illegally seized. A fence was then put around the property and on the same day, a rally of several thousand persons was held in which plaintiff made the following remarks, in part: "Don't let those pigs beat the shit out of you, don't let yourselves get arrested on felonies, *go down there and take the park.*" (Emphasis in decision.)

"Immediately thereafter, several thousand persons proceeded from the rally down Telegraph Avenue toward the aforementioned property where they were met by law enforcement officers. Violence ensued resulting in the next few days in one death, numerous injuries and many arrests." Id. at page 834. The court found: "Under the circumstances shown by the record the statement transcends mere expression of opinion and becomes *conduct*—a distinct, affirmative *verbal act*—overt conduct for which plaintiff could be properly called to account . . . ." Id. at page 837.

The verbal act in Siegel is a deliberate incitement to seize fenced private property in a tense situation.

At the Administration Building, there was no question of "seizing" private property. Professor Starsky was present along with other professors, administrators, students, clergymen and others in a public school building where a group of students were attempting to obtain an interview. When he heard words to the effect that a clear understanding on the part of the students and the Administration was being broken, he called the words to the attention of the students. "Cady is copping (or selling) out."

The outburst consists of a rather crude manner of imparting pertinent and accurate information. It did not call for any action, other than the implied need to clarify the understanding as to a "deal." It did in fact result in such clarification.

It is difficult to view Professor Starsky's outcry apart from the Administration's testimony of his "influence" over students, from all of the evidence of his interest and concern with the students, and from the evidence of three separate acts of persuading students not to take extreme action, once at the Engineering Building and twice during the Administrative Building event. The many acts illustrate the kind of rapport that Professor Starsky had with students, and his ability in his own words to "use that influence to try to keep people (from) engaging in lunatic fringe sorts of activity." Common sense tells us that this kind of "influence" can only be maintained by complete frankness with students. Although we may wish that Professor Starsky had found a more polite form of communication, his frankness with the students in giving them information of interest to them at the instant he heard it, is certainly part of the picture of his own relationships with students, and the credibility he had with them, and part of the reason he was successful on at least three occasions that we know of in controlling potentially extreme student action.

In weighing Professor Starsky's interest in imparting information which would help maintain his rapport with the students against the fears of the Administration, we are mindful of the test laid out in Tinker v. Des Moines:

. . . in our system, undifferentiated fear or apprehension of distur-

bance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk.

. . .

*Supra* at 508 of 393 U.S., 737 of 89 S.Ct.

The question of whether these words are protected is a difficult one, since it depends on whether the Administrators' apprehension of disturbance had some reasonable basis in fact. There is no wish to set a precedent that can be read as protecting every informational outburst made during a tense demonstration. This Court does find that in the context of the total picture here, the Administrators' fears are not well grounded and the words used by Professor Starsky are not of such an inflammatory nature as to lose their First Amendment protection.

We do not consider that this holding is essential to our finding as to the charges based on the Administration Building incident. Even if the words were found to be sufficiently inflammatory to lose First Amendment protection, they are a small part of the whole picture and this would not be sufficient evidence to uphold the Board's finding of a violation of ethics and regulations in student-faculty relationships based on plaintiff's total participation in this incident. Thus, if we were to accept the Committee's finding that the cry might have led to violence, we would still be forced to accept the Committee's conclusion that there is not sufficient evidence to substantiate Charge IV.

 The copies of a letter distributed only to faculty at the entrance of a faculty meeting is "pure" speech. Our discussion of the facts basically is dispositive of the constitutional issue, since we found that the objections to the letter derived entirely from its wording, that nothing in the letter called for immediate action at Arizona State University, and that the purpose of the letter was informational, i. e., to acquaint the faculty with the causes of unrest at Columbia University. The crux of the criticism of the letter is its disrespect for authority. The kind of "disrespect" is based on mere quotation of a dialogue involving in part advocacy of a complete change in the nature of authority. In the absence of any incitement to direct violent action, this kind of abstract revolutionary philosophy is protected. Thus in Keyishian v. Board of Regents of U. of St. of N. Y., 385 U.S. 589, 598, 87 S. Ct. 675, 682, 17 L.Ed.2d 629 (1967), a regulation barring employment of a teacher who "by word of mouth or writing willfully and deliberately advocates, advises or teaches the doctrine of forceful overthrow of government" was found unconstitutionally vague since "It may well . . . prohibit the employment of one who merely advocates the doctrine in the abstract. . . ."

There is another element present in that a quote within a quote contains a vulgarity from the prose work of LeRoi Jones. Plaintiff points out that in Cohen v. Cal., 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the United States Supreme Court found that a jacket bearing the words, "Fuck the Draft," in a corridor of the Los Angeles Courthouse was not "offensive conduct" permitting a criminal conviction, where "The conviction quite clearly rests upon the asserted offensiveness of the words Cohen used to convey his message to the public. The only 'conduct' which the State sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech'." (Emphasis in the quote.) Although *Cohen* as a criminal case is of limited applicability here, it does stand for First Amendment protection of an obscenity used in a political context where unaccompanied by any conduct and not communicated in such circumstances as to constitute "fighting words."

An Administration witness complained that the leaflet was "out of keeping with the, if not sanctified, at least the austere surroundings of a faculty assembly meeting."

There is a serious constitutional question as to whether speech can be stifled because the ideas or wording expressed upset the "austere" faculty atmosphere; certainly the Board has no legitimate interest in keeping a university in some kind of intellectual austerity by an absence of shocking ideas. Insofar as the plaintiff's words upset the Legislature or faculty because of the contents of his views, and particularly the depth of his social criticism, this is not the kind of detriment for which plaintiff can constitutionally be penalized. The United States Supreme Court has emphasized that:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. (citation). The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that *robust exchange of ideas* which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." (Emphasis supplied).

Keyishian v. Board of Regents of U. of St. of N. Y., supra, 385 U.S. at 603, 87 S.Ct. at 683 (1967).

Following this authority and Tinker v. Des Moines, *supra,* this Court finds that under the circumstances of the distribution of the leaflet in this case, the free speech interests of the plaintiff are not outweighed by any interest of the State as an employer in maintaining discipline.

As to the three remaining specifics, we are dealing with speech away from the campus on which plaintiff is employed. The television speech, the press release and the speech at the University of Arizona raise our most serious questions of violation of constitutional rights, the Board's own avowed standards of academic freedom, and of federal due process. In each of these communications, plaintiff spoke or wrote as a private citizen on a public issue, and in a place and context apart from his role as faculty member. In none of these public utterances did he appear as a spokesman for the University, or claim any kind of expertise related to his profession. He spoke as any citizen might speak and the Board was, therefore, subject to its own avowed standard that when a faculty member "speaks or writes as a citizen, he should be free from institutional censorship or discipline." The Board minutes of June 10, 1970 state that this A.A.U.P. standard was observed during the period of the charges. To hold Professor Starsky to a narrower standard than this under the circumstances of this case, where the charges themselves stated that A.A.U.P. standards would be adhered to, might raise a due process question. Such a narrower standard would clearly violate Professor Starsky's First Amendment rights since the A.A.U.P. standard is an expression of the constitutional standard forbidding school administrators from applying any standard to a professor's public speech that is narrower than that of any other citizen. This First Amendment standard has been stated repeatedly and appears in Pickering, *supra,* 391 U.S. at 568, 88 S.Ct. at 1734, 20 L.Ed.2d 811, thus:

> ▪ To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. E. g., Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952); Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247 (1960); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675

(1967). "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents, supra, 385 U.S. at 605–606, 87 S.Ct. at 685.

As restated recently in Perry v. Sindermann, 1972, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570:

. . . a teacher's public criticism of his superiors on matters of public concern may be constitutionally protected and may, therefore, be an impermissible basis for termination of his employment.

Thus, the Administration's attorney's suggested application of the A.A.U.P. guidelines is clearly in error insofar as they are applied to pure public speech as a citizen:

These are professional guidelines. These are the rules of the professions. These are the rules of the hearing in which we are determining the standards to be followed, and I submit that these rules are somewhat narrower than the constitutional privileges that are granted to a citizen speaking. Although a person may have a constitutional privilege as a citizen, he may not have the same privilege as a professional person as a professor under the guidelines of A.A.U.P. because he is abiding by a professional discipline.

■ A teacher has the same First Amendment rights as any other citizen. The Board can not restrict this right although it may balance ". . . the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, supra, 391 U.S. at 568, 88 S.Ct. at 1734.

■ Although this balancing test is technically the same for on-campus speech and speech as a citizen, as a practical matter it may be easier for the school to show a counterbalancing interest where the speech is closely connected with the speaker's on-campus duties. Thus, there may be circumstances in which school discipline requires that a professor acting within his capacity as a teacher, or in his personal relationship on campus, may be held to professional standards of appropriate restraint or greater personal courtesy than that which may be demanded of other citizens, and when a teacher speaks within his own expertise, the school may have a substantial interest in holding him to higher standards of accuracy than if he were an ordinary citizen. However, these narrower standards may not be applied to a faculty member when he speaks publicly as a citizen, in the absence of a showing of an employer's interest sufficient to counterbalance the citizen's interest in his constitutional rights.

The very nature of the charges and the Board's findings against Professor Starsky insofar as they relate to his public speech as a citizen show that the Board failed to recognize its own avowed standards of freedom from discipline when a faculty member "speaks or writes as a citizen."

■ Thus, the Board in finding plaintiff guilty of the summary charge ". . . has not exercised appropriate restraint as becomes a university professor in his public activities . . .", applied a narrow professional standard to Professor Starsky's speech as a citizen.

Throughout the statement of charges and the findings the Board fails to distinguish those circumstances in which Professor Starsky spoke as a professional, under circumstances where the interests of the school balanced First Amendment interest sufficiently to warrant a narrower professional standard of speech, from those circumstances in which Professor Starsky spoke publicly as a citizen and had the right to the same broad constitutional protection afforded every citizen.

In the Board's own summary of the reasons for discharge (June 10, 1970

minutes), the Board fails to distinguish on-campus speech as a teacher from public speech as a citizen in finding ". . . that Dr. Starsky has been guilty of . . . intemperate and unrestrained behavior, inaccurate and misleading statements . . . ."

Charge III holds plaintiff to a professional standard to ". . . show respect for the opinions of others and to be objective in his professional judgment of colleagues."

Charge III is supported in part by subcharges involving on-campus disrespect, and by further subcharges that during a television speech, plaintiff spoke ". . . with *disrespect* toward his employers, the Arizona Board of Regents and made a *false* statement" (Tr. 11 ln. 13; 12 ln. 2), and he gave a press release so worded as to show "*disrespect* toward his employers, the Arizona Board of Regents. . . ." (Emphasis supplied). Tr. 12 ln. 6–7.

Further charges involve a speech at the University of Arizona during which plaintiff clearly disavowed any official capacity, yet he is found to have spoken "with intent to create . . . *disrespect* for the lawful administrative authority." (Charge II). Tr. 10 ln. 10–11.

We find that the statement of the charges and the findings of the Board fails to even recognize the possibility of an issue of citizen's speech, and fails to recognize the protection afforded citizen's speech by its own avowed A.A.U.P. standards.

Our examination of the evidence relating to these subcharges involving public speech as a citizen reveals that the Board set a standard of respect, accuracy, and restraint narrower than that permitted a private citizen in his public speech. All of these three public communications took place outside of the campus on which plaintiff was employed, and all of them dealt with matters of public interest, matters which in fact had received considerable publicity.

Each of these three utterances are attacked on the basis of the words and the alleged intention with which the words were uttered. As to these allegations, the Court is squarely met with the question as to how much professional restraint may be demanded of a teacher in his public utterances on political or philosophical issues. This Court has analyzed these words and in construing their meaning finds that they do not include terms of personal abuse as to any specific individuals; that they do not include a call for any immediate, unlawful, or dangerous action, or disruptive conduct.

In each of the utterances by the plaintiff, certain aspects of the administration of a university are attacked, and there is a call for basic change; but in each case, the attack is on the basis of the power structure, the ideology, the political philosophy of the administration, and never on the basis of individual personality. In none of the speeches is there a call for disobedience or disrespect or disruption in the sense that the audience is told to specifically disobey the Administration's rulings. Professor Starsky's attack is a more profound and philosophical one; he calls for a complete social revolution, and he defends himself from actions by the Board.

This Court finds that the Board, in discharging Professor Starsky on the basis of narrow professional standards of accuracy, respect, and restraint applied to public statements made as a citizen, has violated its own A.A.U.P. standards not to discipline a teacher when he "speaks or writes as a citizen," and has violated Professor Starsky's rights to freedom of speech by applying constitutionally impermissible standards to speech made as a citizen.

As to whether the Board has shown sufficient interest as an employer to balance the teacher's free expression rights, *Pickering* is dispositive. In *Pickering*, the Board of Education dismissed a teacher for writing a letter to a newspaper attacking the school board. At a

hearing, the Board made charges against the discharged teacher in that ". . . numerous statements in the letter were false and that the publication of the statements unjustifiably impugned the 'motives, honesty, integrity, truthfulness, responsibility and competence' of both the Board and the school administration. The Board also charged that the false statements damaged the professional reputations of its members and of the school administrators, would be disruptive of faculty discipline, and would tend to foment 'controversy, conflict and dissension' among teachers, administrators, the Board of Education, and the residents of the district."

The state court found that the Board could reasonably conclude that the teacher's publication of the letter was "detrimental to the best interest of the schools." 391 U.S. at 567, 88 S.Ct. at 1734, 20 L.Ed.2d 811.

The Supreme Court of the United States reversed on that basis that the discharge violated the teacher's constitutional rights in that it failed both of the basic tests set forth above, i. e., a narrower standard was set for the teacher's public speech than that otherwise enjoyed by ordinary citizens and the state did not show that its interest as employer in promoting efficiency balanced the teacher's right to speak as a citizen. The court's application of the balancing tests to the facts in *Pickering* leave us with the impression that although a balancing test may be applied to all questions of academic speech, in the case of public speech by the teacher as a citizen, an extremely strong or unusual case of efficiency would have to be made to outweigh a citizen's interest. The detailed, factual findings in *Pickering* are useful to us in that they supply us with guidelines for applying the balancing test to the facts herein. Thus, *Pickering* found:

1. In weighing a charge of disloyalty to employers:

The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. 570 of 391 U.S., 1735 of 88 S.Ct. This finding in *Pickering* is equally applicable to the three instances of public speech made by Professor Starsky and with which we are concerned here, since none of the speeches is disruptive of a close working relationship.

2. In weighing a charge of falsity: ". . . his position as a teacher in the district did not qualify him to speak with any greater authority than any other taxpayer. . . . We are thus not presented with a situation in which a teacher has carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts. . . . What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operations of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."

391 U.S. at 572–573, 88 S.Ct. 1736–1737.

Professor Starsky is charged with falsity in a television statement involving the Board's legal authority.

This Court finds that there is no credible evidence to support the charge of falsity. The *Pickering* guidelines would dispose of this charge even if it were factually supportable, however, since there was no showing that Professor Starsky's position as a teacher of philosophy gives him any special expertise in the law, nor was the statement shown to impede the regular operation of the school.

3. *Pickering* strongly asserts that even the strongest kind of criticism of a remote employer such as the Board of Regents is not sufficient to outweigh a teacher's First Amendment rights, thus:

> . . . To the extent that the Board's position here can be taken to suggest that even comments on matters of public concern . . . may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.

391 U.S. 570 at 570, 88 S.Ct. at 1735.

The heart of the charges against Professor Starsky insofar as they relate to the three pure public utterances here is in the nature of the extremely sharp criticism involved. In the press release, an action of the Regents is characterized as hypocritical, and the motives of the Regents are questioned; in the television speech, Professor Starsky questions the moral propriety of the Regents bringing charges on a matter that Professor Starsky believed to be of academic concern only to teachers and students. In the speech given at the University of Arizona, Professor Starsky sharply criticizes society in general and universities in particular. It is obvious, therefore, that the Board confuses constitutionally protected criticism with disrespect.

4. Finally, *Pickering* warned against equating the remote employer's personal interest with the interest of the school, finding that the only way that the Board could find that certain statements were detrimental to the schools ". . . was to equate the Board member's own interest with that of the schools." 391 U.S. at 571, 88 S.Ct. at 1736. Here, too, we find the principal detriment involved in the television speech and the press release involves the Board members' own interest in freedom from bitter criticism rather than the interest of the school.

■ We can find no evidence of "detriment" to the school interests as such in the speeches here other than the detriment resulting from the unpopularity of plaintiff's views. Thus, even loss of legislative funds and public misunderstanding, where these detriments are caused by the public's violent disagreement with the views expressed by a faculty member, are not the kind of detriments that can be balanced against a teacher's right to free expression. It is the severity of the criticism of the Board's actions and the profound nature of the political, social, economic, and philosophical disagreement with generally accepted views expressed by Professor Starsky—in short his social revolutionary trotskyite interpretation of the role of the university administration—which is at the core of the charge of disrespect and disloyalty. Basically, the charges as to these speeches go to the depth and extent of the criticism. Under *Pickering*, the kinds of criticism involved in each of these speeches under the circumstances in this case are completely protected. We find as to each of the three public speeches, including the speech at the University of Arizona, the press release, and the television speech, that the Board of Regents violated its own announced standards, and the A.A.U.P. standards, in disciplining plaintiff for his public speech as a citizen. This Court has already found that the Board applied a standard narrower than that permitted by the First Amendment. This Court now finds that no employer's interest was shown sufficient to balance Professor Starsky's constitutional right to free expression.

The Court having found that at least as to two of the specific charges, i. e.,

the charges involving personal abuse of Mr. Sumner and the cutting of one class, there is supporting evidence and no constitutional protection, and as to six specific charges, they are not supported by the evidence and they are wholly or in part based on constitutional restrictions, we now must decide whether the substantial or primary cause of the discharge is impermissible.

We may get some guidance in comparing two cases, each dealing with an allegation of discharge for impermissible reasons, but each involving some unprotected conduct. In Robbins v. Board of Education of Argo Com. H. S. Dis., 313 F.Supp. 642 (D.C.1970), recovery was denied a probationary teacher where the facts showed she was late on 140 out of 167 days; she held parties in the classroom in violation of school regulations; failed to perform corridor duty approximately fifty percent of the time, and left class unattended on numerous occasions. There was evidence that other teachers broke the rules. "There was no evidence, however, that any teacher ignored school policy to an extent even approaching that of plaintiff." 313 F. Supp. at 646. The court refused to jump from an arguable animus to plaintiff's First Amendment rights to an inference that Miss Robbins was discharged ". . . because of her free speech activism, or because she is black, . . . ." Id. page 647. The court seemed to take a great interest in the facts which related to Miss Robbins' performance as a teacher in the classroom. The court pointed out that there was no evidence that plaintiff was an "excellent teacher" stating that such evidence would have been significant.

In Johnson v. Branch, 364 F.2d 177 (1966), the Fourth Circuit faced a similar problem of a black teacher who filed a suit claiming that her contract was not renewed because of civil rights activity and was related to her race. The District Court dismissed plaintiff's complaint and the Circuit Court reversed finding that plaintiff was ". . . a well-qualified, conscientious, and compe-

tent teacher. . . ." 364 F.2d at 178. She had been charged with seven infractions of the school rules, which the court discusses as follows:

> None of them involved the quality of her classroom work. Instead they covered such matters as being 15 minute late to supervise an evening athletic contest; . . . failure to furnish a written explanation for not attending a P.T.A. meeting; failure to stand at the door of her classroom to supervise pupils. . . ."

Id. p. 178. The court found that these (and similar) infractions "being the only basis for the school board's decision, we find that the action of the school board was arbitrary and capricious. * * * The only reasonable inference which may be drawn from the failure to renew Mrs. Johnson's contract in the face of her splendid record of twelve years on such trivial charges was the Board members' objections to her racial activity." Id. 182.

Both cases are useful in that although the positive evidence of action punitive of protected right was weak in both cases, the courts very closely examined the plaintiffs' competency as teachers, and the seriousness of the alleged violation of the rules. In one case, a teacher of uncertain competence was guilty of serious infractions of school rules; in another, a teacher of unquestioned competence is terminated on minor charges, forcing the court to conclude the reason for termination was protected. This Court finds that the factual picture here more closely approximates the latter than the former.

In attempting to determine whether the Board's primary or substantial reason and motivation for termination involved protected activity of the plaintiff, we can do some simple addition. There was evidence of two specific incidents—one involving personal insult to Mr. Sumners for which no formal reprimand was made, which occurred about two years prior to the charges and which happened prior to the time the stability of employment or Arizona State Uni-

versity's form of tenure was given, and was known to have happened. The other incident involving one incident of class cutting in violation of a general policy in favor of attendance in a clear case of selective enforcement, since a more direct violation of the same policy by another teacher was punished by a minor reprimand. Of eight specific charges which the Board found that plaintiff committed, there is insufficient evidence and some constitutional protection involving six of them. Perhaps most troubling, the triers of fact who had the advantage of demeanor evidence found that the charges did not amount to unfitness. The Board disagreed, but give us no rational or factual basis in evidence for their disagreement, and we have searched the record to support their conclusion but are unable to do so.

■ We can conclude from this that the evidence fails to show the plaintiff is unfit for his position. The Board's finding of unfitness is primarily or substantially motivated by those charges which impermissibly restrict plaintiff's First Amendment rights.

Yet, something more seems to need to be said here. The finding of fitness or unfitness in this case involves something more than addition of charges. During the course of the thirteen hearings involved in this case, everyone seemed to agree that you could not get a picture of the man's six years of service (or disservice) to the University by merely looking at each incident involved in the charges. The prosecutor spoke of these incidents as building blocks, with the whole picture adding up to a lack of professionalism, that may not be apparent in any one incident alone.[9]

Perhaps it is only fair to consider the Administration's contention that the sum of the acts described here are somehow more of a threat to orderly school administration than can be gathered from a mere enumerating of the individual parts. Certainly in trying to form a whole picture on the evidence of fitness, we must consider Professor Starsky's department chairman's claim that some of the incidents are very atypical and that in judging Professor Starsky's fitness, we must consider his unquestioned value to the school as a top teacher, counselor of students, research worker, and scholar of some national visibility. Does Professor Starsky's six year record constitute a threat to discipline? We have evidence of a good deal of Professor Starsky's professed views both in the form of speeches, which form the basis of the charges, and in the many speeches he made in giving evidence in his defense during these hearings. He often speaks in terms more blunt than one usually expects of a teacher. He admits he "lost his cool" one or two times. Yet, only once do we find his speech truly offensive, i. e., re Dr. Sumners. We have examined his speech to see if taken as a whole, it constitutes the kind of direct call to violence that might present a real threat to the orderly administration of a school. We find that Professor Starsky's expressions tend to be an abstract kind of marxist, socialist, trotskyist social revolution that calls for social revolution at some future time, but that nowhere calls for the kind of immediate, violent action that might constitute a direct threat to the school's disciplinary interest. Professor Starsky professes to be a very profound kind of radical. He calls for the most basic kind of change in society. Yet he does not directly answer the questions, when and how. He waits for the masses to accept his point of view, at which time this majority will take control. It appears to this Court that Professor Starsky will have a long wait before this condition for revolution is ripe. From the very specific acts of clearing the aisles, to convincing the students in the Administration Building to

---

9. Perhaps reminiscent of the case of the Earl of Strafford of whom Rushworth wrote in his "Historical Collections" that being forced to find a way to dispose of him, Charles I, by bill of attainder, piled blunders and misdemeanors into a package called "treason by accumulation," then sent the Earl of Strafford to his death in 1641.

go home at 5:00 o'clock P.M. the first day, and again to go home the second day, his attempts to avoid violence at the Engineering Building, his careful avoidance of a call for any specific immediate action, and his confining his remarks to generalities at the University of Arizona, even the fact that he did not give copies of the Columbia article to students—all bespeak a desire to calm the more impulsive and disruptive reactions of the radical student, to prevent violence and bloodshed. In discussing the leaflet re Columbia, Professor Starsky comments, ". . . you can't simply wait for things to flare up in your face, because then all you're left with is stop gap action, repressive action, calling police, clubbing heads, doing all these insane things that get done in other parts of the country. And no one wants to see that happen." Tr. 488 ln. 14–21.

In relation to the Administration Building incident, Professor Starsky says he acted "as an individual and as an individual, I attempted to keep things orderly." In discussing mass action, Professor Starsky says, ". . . the only time that ever becomes a problem is when there are a few cuckoo individuals who counsel violence. Then you have to really bring to bear all the machinery of moral authority that the mass can generate. And that's where you really need people who do have influence to use that influence to try to keep people from wrecking the cause of the righting the injustice by engaging in lunatic fringe sorts of activity." Tr. 556 ln. 14–23.

The record as a whole supports a picture of Professor Starsky as a person who used his own influence to control the lunatic fringes, who counseled order and non-violence, and who, although he called for profound social change and was willing to go along on peaceful demonstrations, consistently acted to prevent heads from being bashed in. In short, the picture of Professor Starsky that emerges from the whole incident is a man who cries for social justice, but has a basic horror of the sight of blood, a man who exercised every kind of moral control over the wilder, more disturbing elements among the students, a man whose role is characterized again and again by witnesses as that of a peacemaker. Professor Starsky's Marxist revolution is oddly anachronistic and reminiscent of the 1930's. In finding that there is no immediate threat to the University in Professor Starsky's radicalism, we must also find that the Board's attempts to use Professor Starsky's speech as a basis for discipline is equally anachronistic and reminiscent of the 1950's and much more dangerous.

The crux of the matter is that although Professor Starsky looks forward to different rules and a different kind of administration, "But that doesn't mean you go around breaking them or violating them. You're prudential and you look forward to a day when society will be different, and be organized in a different way, and you will have different rules. . . ."

Looking at the evidence as a whole insofar as it reflects the sum and substance of six years as a member of the faculty, an acknowledged and respected teacher and scholar, and a man with national visibility; and after carefully studying all the evidence which the Board of Regents had before it as a basis for its action, the isolated incidents that could reasonably lead to some disciplinary action were of such a minor nature or long ago, and the major emphasis in the charges is so clearly based upon protected ideology, that this Court must conclude that the primary reason for the discipline of Professor Starsky is grounded in his exercise of his First Amendment rights in expressing unpopular views.

We therefore grant plaintiff's motion for summary judgment on the issue of liability and declare that plaintiff's termination violates his right to free speech and involves a violation of federal due process insofar as the discharge was based on standards of academic freedom narrower than the standards noticed in the charges.

We further declare that the defendants have a duty to reinstate plaintiff to his position with all of its emoluments and perquisites as if termination had never occurred.

Plaintiff is to prepare a form of permanent mandatory injunction in keeping within this order no later than January 10, 1973.

The parties are to file a pretrial order on the remaining issue of damages no later than January 31, 1973.

## APPENDIX

*Text of Local Rule 11(h)*

"*Motions for Summary Judgment.* Any party filing a motion for summary judgment shall set forth separately from the memorandum of law and in full, the specific facts on which he relies in support of his motion. Any party opposing a motion for summary judgment shall file prior to the hearing, a concise statement of all material facts, separate from any memorandum of law, as to which there is a genuine issue precluding summary judgment in favor of the moving party. In the alternative, the movant and the party opposing the motion shall jointly file a stipulation signed by the parties setting forth a "statement of the stipulated facts" if the parties agree there is no genuine issue of any material fact. As to any stipulated facts, the parties so stipulating may state that their stipulations are entered into only for the purposes of the motion for summary judgment and are not intended to be otherwise binding."

\- \- \- \- \- \-

*Text of Television Broadcast* (from Administration Exhibit 14)

"The Regents have no right to discuss either the matter of my failure to meet with a class on January 14, or my political views and activities. The only people who have a right to be concerned about my having cancelled a class, which was to meet on January 14, are my students and colleagues. Professors in American universities do not teach in terms of class hours, but in terms of credit hours. This means that the responsibility for determining whether or not a professor has given the subject matter of a course adequate treatment, falls clearly on his judgment, the judgment of other professors who understand the subject matter, and the students who are enrolled in the course to master the subject matter. Nobody has the right to judge mastery of a particular subject matter in terms of a fixed number of class hours. Thus, any action begun against me for cancelling a class must be taken by faculty and students and not by the Regents."

\- \- \- \- \- \-

*Text of Press Release* (from Administration Exhibit 17)

"The action taken by the Regents on Saturday can only be described as arrogant, cynical and hypocritical. In effect, the Regents have abandoned the pretense of commitment to university autonomy by ignoring the recommendation of the ad hoc committee. The situation is rather like that of someone who is cleared by a grand jury investigation but ordered to stand trial anyway.

The demand for a full dismissal hearing in the face of the ad hoc committee's report that there is not sufficient evidence for such a hearing is tantamount to the demand for a "witch-hunt". The obvious purpose of a formal hearing at this time can only be to create an atmosphere favorable to a judicial lynching. I am convinced that the Regents intend to use a formal hearing in exactly the same way that they used the informal hearing; they will ignore it. Hearings are merely warnings to other professors of the consequences they face if they engage in radical political action or any action that the Regents do not approve. Once again we find the Regents in the business of intimidating professors who object to the war in Vietnam and the role of the university as an accomplice of the warmakers and the racists in this country.

I call upon the ad hoc committee, the Academic Freedom and Tenure Committee, the Faculty Senate and the students and faculty of Arizona State University to stop the witch-hunt.

I have consulted an attorney about possible legal action against the Regents and the Administration of Arizona State University. Either he or I, or both of us, will issue a statement on that in the next few days.

The support I have been receiving from around the country and the recent *State Press* poll of ASU students clearly reveal that the age, background, and outlook of the Regents are not representative of either Arizona or the country at large. The issue here, however, is not merely that a small, unelected and unrepresentative group of men and women have much more power than they have a right to have in a democratic society, but that they are the instruments of reactionary forces who are trying to undermine the democratic rights we all take for granted."