# FOIA Appeal from Denial of Access to FBI COINTELPRO Files Regarding Professor Morris Starsky

As a matter of administrative discretion, the Department of Justice should grant the FOIA request of an attorney for the FBI's COINTELPRO-New Left files regarding his client, a professor at Arizona State University and an active member of the Socialist Workers Party.

FOIA Exemption (7) is technically applicable to the withheld documents. However, like all of the exemptions, Exemption (7) is only discretionary, and should not be asserted unless such action is in the public interest. Assertion of the exemption is not recommended for these documents.

November 27, 1974

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

This memorandum transmits for your signature a proposed disposition of Mr. Kyman's appeal, on behalf of his client, Professor Morris Starsky, from Director Kelley's denial of Mr. Kyman's request for access to all Federal Bureau of Investigation ("FBI") records pertaining to his client. Fourteen of the documents are in COINTELPRO files and the rest are in investigatory files. Director Kelley's denial was predicated on Exemptions (7), (1), and (5) of the Freedom of Information Act ("FOIA"), exempting from mandatory disclosure, respectively, investigatory files compiled for law enforcement purposes, material classified pursuant to executive order, and inter-agency or intra-agency memoranda involved in the government's internal deliberations. 5 U.S.C. § 552(b)(7), (1) & (5). A response is due immediately.[1]

The proposed response affirms almost all of Director Kelley's denial, but grants access as a matter of administrative discretion to some of the 14 documents pertaining to Professor Starsky generated as part of the COINTELPRO-New Left program.

## I. Documents at Issue

Mr. Kyman has requested access to all Bureau files and records pertaining to his client and is especially interested in any communication between the Bureau and the Board of Regents of the University of Arizona. In addition to the 14 documents pertaining to Professor Starsky in the COINTELPRO-New Left files, he is the subject of four conventional FBI investigatory law enforcement files. We

---

[1] At the request of the Bureau the original due date of September 16, 1974 was extended to October 15, 1974 by letter dated September 11, 1974. A copy of this extension letter is attached to Mr. Kyman's appeal letter of August 13, 1974. The due date was further extended to November 15, 1974 by letter of this Office dated October 21, 1974. On November 15 I advised Mr. Kyman by telephone that a positive response would soon be forthcoming.

recommend that access to all of these be denied on the basis of Exemptions (7) and (1).

With regard to the 14 COINTELPRO documents, we recommend withholding four of them in their entirety on the basis of Exemptions (1), (7), and (5). For another four, we recommend release with deletions of material that either can be considered outside the scope of Mr. Kyman's request or whose release would either constitute an unwarranted invasion of personal privacy of individuals other than Mr. Starsky (Exemption (6)) or jeopardize FBI sources or informants (Exemption (7)). The remaining six documents we recommend making available without deletions.

Among the COINTELPRO documents, the most serious difficulty is presented by the anonymous letter addressed to the Arizona State University ("ASU") Faculty Committee on Academic Freedom and Tenure, which was conducting hearings on Professor Starsky's continued tenure as a faculty member. It was signed "a concerned alumnus" by an FBI agent with the prior approval of the Director; it was designed to neutralize Starsky as an active member of the Socialist Workers Party, by discrediting him in his academic community.

The letter related as true an alleged incident in which Professor Starsky, his wife, and two male associates invaded the apartment of a student co-worker and threatened to beat him unless he returned certain socialist material he had borrowed. It went on to characterize the incident as evidence of the totalitarian nature of Professor Starsky's academic socialism, analogous to that advocated by Himmler or Beria. It suggested that if Starsky were not insulated by his position at the University, he would have been properly punished for this conduct.[2]

The following subsequent events are relevant to the gravity with which this letter must be regarded: The Committee to which the letter was addressed did not recommend Starsky's dismissal, but the University's Regents overrode that decision. It is uncertain whether the letter or its contents were considered by the Regents.[3] Starsky sued in federal court to be reinstated, in which suit he was

---

[2] We disagree with the Bureau's characterization of the contents of this letter as "factual." Although the narrative was taken from the Bureau's substantive subversive investigatory file on Professor Starsky, the incident described is only documented by the ASU student's complaint to the local police. This complaint was voluntarily dropped, and there is no proof that the incident actually took place as alleged. Furthermore, the letter questions Professor Starsky's competence and fitness as a University employee because of the qualities evidenced by the alleged incident. This judgmental conclusion can in no way be considered "factual."

[3] The Bureau's memorandum asserts that the Regents fired Starsky "for reasons unrelated to the anonymous letter." This is true, if it refers to the reasons which the Regents *expressed*. It is also technically true if it refers to the "primary reason" which the court in *Starsky v. Williams* found to have been the true principal motivation of the Regents—namely, Starsky's expression of unpopular views. 353 F. Supp. 900, 927 (D. Ariz. 1972). But on the basis of the limited information we now possess, it is impossible to tell what effect the letter, or secondhand accounts of the letter, might have had on the Regents' view of the case. In any event, regardless of whether there was any direct or indirect effect upon the firing, the matter would seem sufficiently serious if we merely accept the Phoenix agents'

represented by the same lawyer who has made the present FOIA request in his behalf. The suit was a total success, the court finding that the Regents' action was intended to repress Starsky's free speech and violated his First Amendment rights. *Starsky v. Williams*, 353 F. Supp. 900 (D. Ariz. 1972).[*]

## II. Applicability of Exemption (7) to the 14 COINTELPRO-New Left Documents

The principal basis on which it might be asserted that the 14 COINTELPRO-New Left documents can be withheld is Exemption (7), which protects "investigatory files compiled for law enforcement purposes." Pub. L. No. 90-23, 81 Stat. 54, 55 (1967) (adding 5 U.S.C. § 552(b)(7)). We do not find any basis for the applicability of other exemptions asserted by the FBI, a matter which we will discuss below.

In our view, it can be maintained that Exemption (7) is applicable, and such a position is consistent with the action you took previously in affirming the denial of most COINTELPRO documents to Fred Graham of CBS News. Such a position risks reversal by a judicial finding that the "investigatory files" exemption does not apply to files compiled for intelligence purposes;[4] or that the "investigatory files" exemption is not a "blanket" exemption, applying to all documents contained within the applicable file, whether or not they individually are prepared for law enforcement purposes.

Because of considerations discussed below, we think the risks of a judicial finding that Exemption (7) is not applicable are much higher in this case than in Graham; as will also be discussed below, it may be a reversible abuse of the discretion conferred by the Exemption to withhold the documents in this case. Nonetheless, it is our position that the Exemption is technically applicable.

## III. Advisability of Asserting Exemption (7)

Like all of the exemptions, Exemption (7) is only discretionary, and should not be asserted unless in your opinion such action is in the public interest. I cannot recommend such an exercise of your discretion in the present case.

---

own evaluation that the letter succeeded in thoroughly discrediting Professor Starsky in the academic community.

[*] Editor's Note: The district court's ruling in *Starsky v. Williams* was affirmed in part, reversed in part, and remanded for further proceedings, 512 F.2d 109 (9th Cir. 1975).

[4] At the time you considered the Graham appeal, the D.C. district court had already so held, in *Stern v. Richardson*, 367 F. Supp 1316 (D.D.C. 1973). Since that time, the same court has reaffirmed this position. *Black v. Sheraton Corp.*, 371 F. Supp. 97 (D.D.C. 1974).

## A. Policy Considerations

In the last analysis, the only policy reason for withholding most of the requested documents is to prevent a citizen from discovering the existence of possible misconduct and abuse of government power directed against him. In my view, this is not only no reason for asserting the exemption; it is a positive reason for declining to use it, even where other reasons for asserting it exist. The obtaining of information of this sort is perhaps the most important reason for which the Freedom of Information Act exists.

## B. Practical Considerations

Even if you are able to sustain the denial in this case in the courts (which is far from certain and perhaps unlikely), the Freedom of Information Act revision recently passed would require the documents to be provided as soon as a new request is made under the newly enacted legislation. Pub. L. No. 93-502, § 2(b), 88 Stat. 1561, 1564 (Nov. 21, 1974) (amending 5 U.S.C. § 522(b)(7)). We believe that the principal basis for withholding COINTELPRO documents of this type under the new legislation will be the "privacy" provision of the revised Exemption (7) (5 U.S.C. § 522(b)(7)(C))—which is unavailable here because it is the subject himself who is making the request.

Moreover, despite the modification of Exemption (7) in the recent legislation, judicial rejection of our assertion of non-coverage under the present law might well be based upon such a ground that it would impair our position with respect to COINTELPRO files when the new legislation becomes effective. For although under the new law Exemption (7) is eliminated as a files exemption, the specific bases for non-disclosure which the new Exemption (7) provides still apply only to "investigatory" records. It is only with respect to an "investigatory" record that withholding will be able to be supported on the basis of disclosure of investigative techniques (the new Exemption (7)(E), 5 U.S.C. § 552(b)(7)(E)) or disclosure of the identity of a confidential source (the new Exemption (7)(D), *id.* § 552(b)(7)(D)). Thus, if we provoke a judicial decision to the effect that COINTELPRO records are not records compiled for investigative purposes, we have substantially impaired our position.

The chances of losing the present case in the courts are immensely greater than were the chances of losing the Graham request. We are, first of all, dealing with a requestor who has already filed and won a law suit dealing with the filing of these documents. *Starsky v. Williams*, 355 F. Supp. 900 (D. Ariz. 1972). The lawyer who represented him in that suit is representing him in this appeal. It is in our view certain that he will sue if the appeal is denied.

In the Graham request, since only "program" files were requested, it would have been possible to litigate the denial on a relatively abstract level, arguing that counter-intelligence programs, as programs, are a necessary form of preventive

law enforcement. There was a fair chance that this line of defense could have avoided any judicial receptivity to the suggestion that the documents in question should be examined in camera. In the present case, by contrast, there is a very specific, concrete set of actions which is the subject of the inquiry. It is unimaginable that a court would sustain our denial without looking at the documents in question. It is further unimaginable that having looked at the documents, it would fail to find some way to hold against us—perhaps by denying the "investigative" character of all COINTELPRO activities, with the adverse effects described above.

### IV. Availability of Other Exemptions

Although our recommendation is not based upon the unavailability of exemption in this case, but rather on the undesirability of asserting it, it is nevertheless pertinent to discuss several other exemptions which the FBI memorandum asserts to be applicable. The Bureau asserts the applicability of Exemption (2), covering documents "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). The assertion of the applicability of that exemption in a case similar to this was specifically rejected by the D.C. district court in the *Stern* case. 367 F. Supp. at 1319–20. It has generally been rejected in areas other than those which would involve disclosure of the government's "play book." *See, e.g.*, *Cuneo v. Laird*, 338 F. Supp. 504 (D.D.C. 1972), *rev'd and remanded in part*, 484 F.2d 1086 (D.C. Cir. 1973); *Hogan v. United States*, --- F. Supp. --- (S.D. Fla. 1974).\*

The Bureau's memorandum further asserts the possible applicability of Exemption (3), which permits the withholding of documents pertaining to matters "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). It relies for this on the general statute prohibiting communication of material "relating to the national defense" which "could be used to the injury of the United States or to the advantage of any foreign nation." 18 U.S.C. § 793(d). Although there may be some COINTELPRO documents which may meet this description, the 14 documents involved in the present appeal are assuredly not among them. The mere fact that Professor Starsky was being investigated because he was active in the Socialist Workers Party—without any indication or suspicion that he obtained any defense secrets or had any connection whatever with foreign powers—is by no stretch of the imagination sufficient to render all the documents pertaining to his investigation documents "relating to the national defense." And it is even less

---

\* Editor's Note: We have not located the unpublished decision cited here, but it is likely from the case of *James J. Hogan v. United States*, No. 73-1385 (S.D. Fla.), which is cited in the Freedom of Information Act Source Book, S. Doc. No. 93-82 (1974). The Freedom of Information Act Source Book indicates that the plaintiff in *Hogan* was seeking "the Department of Justice Wiretap Manual" and that the court denied the government's motion to dismiss in October 1973. *Id.* at 188.

likely, if they should relate to the national defense, that they could be used to the injury of the United States or to the advantage of any foreign nation.

## V. Recommendation

We recommend disclosure of those documents and portions of those documents from the COINTELPRO-New Left files pertaining to Professor Starsky which are enumerated and recommended for disclosure.* In particular, we recommend the release in their entirety of (a) the April 7, 1970 Airtel requesting authorization to write the anonymous letter to the members of the Committee on Academic Freedom and Tenure; (b) the anonymous letter sent to the members (the author of which is not an alumnus of the University); (c) the April 24, 1970 instruction to write the letter; (d) the May 12, 1970 acknowledgement of the authorization; and (e) the June 30, 1970 letter from Phoenix to headquarters commenting on the results of the "neutralizing" activity.

ANTONIN SCALIA
*Assistant Attorney General*
*Office of Legal Counsel*

---

* Editor's Note: The memorandum referred here to an attachment listing the COINTELPRO-New Left files recommended for disclosure. That attachment was not preserved in our daybooks. It appears that some, if not all, of the listed files were ultimately released. *See* Michael Newton, *The FBI Encyclopedia* 322-23 (2003); James K. Davis, *Spying on America: The FBI's Domestic Counterintelligence Program* 59-60 (1992); Nicholas M. Horrock, *Files of F.B.I. Showed It Harassed Teacher*, N.Y. Times, Jan. 29, 1975, at 12.